# LANTRY v. WALLACE.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 180. Argued March 11, 1901.—Decided May 27, 1901.

This action was brought by the receiver of a national bank under Rev. Stat. § 5151, providing that share holders of every such association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts and engagements of such association, to the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares.

Assuming that the defendant became a shareholder in a national bank in consequence of fraudulent representations of the bank's officers, two questions are presented for determination: 1, Whether such representations, relied upon by defendant, constituted a defence in this action, brought by the receiver only for the purpose of enforcing the individual liability imposed by § 5151, Rev. Stat., upon shareholders of national banking associations? which question is answered in the negative; and, 2, Can the defendant, because of frauds of the bank whereby he was induced to become a purchaser of its stock, have a judgment against the receiver, on a counterclaim for money paid by him for stock, to be satisfied out of the bank's assets and funds in his control and possession? which question is also answered in the negative.

The present action is at law, its object being to enforce a liability created by statute for the benefit of creditors who have demands against the bank of which the plaintiff is receiver. If the defendant was entitled, under the facts stated, to a rescission of his contract of purchase, and to a cancellation of his stock certificate, and, consequently, to be relieved from responsibility as a shareholder of the bank, he could obtain such relief only by a suit in equity to which the bank and the receiver were parties.

Whether a decree based upon the facts set forth in the answer, even if established in a suit in equity, would be consistent with sound principle, or with the statute regulating the affairs of national banks, and securing the rights of creditors, is a question upon which this court does not express an opinion.

The purchase of this stock by the bank under the circumstances was *ultra vires*, but that did not render the purchase void.

THE case is stated in the opinion of the court.

*Mr. C. N. Sterry* for plaintiffs in error. *Mr. Eugene Hagen* and *Mr. I. E. Lambert* were on his brief.

*Mr. William C. Cochran* for defendant in error. *Mr. J. McD. Trimble* and *Mr. W. H. Wallace* were on his brief.

Mr. Justice Harlan delivered the opinion of the court.

This action was brought by the receiver of the Missouri National Bank of Kansas City, Missouri, under section 5151 of the Revised Statutes, providing that the shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts and engagements of such association, to the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares.

The case was determined in the Circuit Court upon demurrer to the answer and cross-petition of the defendant Lantry, and the action of the court in sustaining the demurrer and giving judgment for the plaintiff was affirmed in the Circuit Court of Appeals, Judge Thayer delivering the opinion of the court. 97 Fed. Rep. 865. Judge Sanborn dissented for the reasons set forth in his dissenting opinion in *Scott* v. *Latimer*, 89 Fed. Rep. 843, 857–862; 60 U. S. App. 720, 743–751, which was the case recently decided by this court under the title of *Scott* v. *Deweese*, 181 U. S. 202.

The petition set forth the appointment by the Comptroller of the Currency on the 3d day of December, 1896, of the plaintiff Wallace as receiver of the bank. It alleged that at the time of the bank's failure the defendant was the owner and holder of two hundred shares of its stock of the par value of $100 each; that on the 30th of July, 1897, it appearing to the satisfaction of the Comptroller that it was necessary to enforce the individual liability of stockholders, as prescribed by sections 5151 and 5234 of the Revised Statutes of the United States, that officer made an assessment upon shareholders for $250,000 to be paid by them ratably on or before the 30th of August, 1897; and that he had made demand upon stockholders for

$100 upon each share of capital stock held and owned by them respectively at the time of the failure of the bank.

The defendant made two separate defences. In setting out the first defence he denied that he was then or had ever been the owner of the two hundred shares of the stock referred to in the petition otherwise than as set forth by him.

The case made by the answer of the defendant was substantially as follows:

A short time prior to April 18, 1896, D. V. Rieger, president of the bank, and who had been such from its organization, solicited the defendant and one Calvin Hood to purchase some shares of the stock of the bank and become stockholders. He persistently urged upon them that it was the desire of the bank to have them own its stock and their names connected with it, as they were men of means and had a large business acquaintance in the State of Kansas, and their connection with the bank would be of benefit to it by attracting and securing a large amount of Kansas business otherwise not obtainable.

In the preliminary negotiations for the purchase of the stock Rieger represented that the bank was in a sound, healthy financial condition, free from debts, earning large profits, and paying dividends, and that he was ready and willing to submit to them a detailed statement showing its financial condition.

In consequence of his statements the defendant and Hood called upon Rieger at the banking house of the bank with a view of investigating its condition.

During such preliminary negotiations Rieger continued to act as president of and for the bank, and all statements made by him during the negotiations were made in his capacity as president of the bank, with its knowledge, consent and authority.

The defendant and Hood informed Rieger that they had been induced by him to investigate the condition of the bank with a view of purchasing some of its shares, and they called on him for a full and complete history and detailed account of its business and financial condition. He at once promised to submit to them a faithful statement and history of the bank from its organization, and agreed to submit such statement to

any expert bank examiner they might select, if they desired him to do so.

The defendant together with Hood then entered upon such investigation which covered a period of several weeks—Rieger representing at the time that the bank was originally organized with a capital stock of $500,000, all of which had been actually paid for by the subscribers thereto and the money deposited as required by law; that some time in July, 1893, on account of the extreme stringency in money matters and panics, the bank suspended, but upon full investigation by the Comptroller of the Currency, and a full report of the national bank examiner submitted to that officer, it was permitted to resume business; that the Comptroller required the bank to reduce its capital stock to the extent of $250,000, to cover any loss it might have sustained previous to that time; and that this left outstanding the sum of $250,000 of the capital stock, all of which had been actually issued and paid for by the shareholders of the bank at that time.

Rieger submitted to the defendant a report by the Comptroller in support of his statements, which was in words and figures as follows: "This bank [referring to the Missouri National Bank of Kansas City] suspended on the 17th inst., because of the run on the part of its depositors. There was nothing in its condition to warrant this run or occasion suspicion as to its insolvency. It seems to have been prudently managed and its resources are unusually free from items of questionable value, there being no bad debts. The bank is solvent and should be permitted to resume."

He also submitted to defendant a bulletin issued by the Comptroller, dated July 28, 1893, which was in words as follows: "The Missouri National Bank of Kansas City, Missouri, having complied with the conditions imposed by the Comptroller of the Currency, and its capital stock being unimpaired, has this day been permitted to reopen its doors for business. The bank opens with plenty of money on hand, and is wholly solvent and safe."

He represented to the defendant that the statements contained in the above report and bulletin were absolutely true and

correct, and that the bank had been frequently examined after it resumed business in July, 1893, by bank examiners and experts, who uniformly and truthfully reported the bank in good, healthy and prosperous condition, and entirely free from bad loans or unsecured paper; that all the paper held by the bank was fresh, clean paper and well secured, and that the interest on its securities had been promptly paid, and there was not among its assets a single item or piece of paper that had not been secured or kept alive as provided by the banking laws of the United States. A list of the securities and assets of the bank was submitted to the defendant by Rieger, he stating that each and every item on the list was worth its face value and was fully secured, and that the bank was and had been since its organization doing a large and profitable business, accumulating a large surplus and paying an annual dividend of six per cent to the stockholders.

After defendant received the above statements from Rieger he secured the services of two expert bank examiners to whom Rieger made the same statements and representations about the assets and condition of the bank, thereby inducing them to believe such statements to be true and to so report to the defendant. Relying upon such representations, defendant agreed with Rieger, as president, to purchase certain shares of its capital stock, which the latter represented was the property of the bank, and which he represented had been theretofore acquired in a lawful way, and paid cash therefor, receiving from him " a certificate of stock dated the 18th day of April, 1896, and numbered 611, and purporting to be issued by the bank and under its seal as of that date, and that this certificate represented the two hundred shares of stock which the defendant supposed he was purchasing, being the same stock mentioned and described in plaintiff's petition, for this defendant never at any time nor upon any occasion purchased or attempted to purchase any other stock of said bank for himself, and never at any time received for himself any certificate of stock purporting to be a certificate for stock of said bank other than the said certificate numbered 611." The bank received the money so paid by the defendant for the stock, namely, the sum of $20,000, and the same was for the use and benefit of the bank.

The defendant continued to be the holder of such certificate of stock, without the knowledge or the means of knowing that the bank was insolvent, until on or about the 2d day of December, 1896. From the time of its delivery to him the bank was apparently doing a very large and prosperous business, having a daily average of about $1,500,000 deposits, and apparently on an average in good bills receivable about $1,300,000. But owing to the vast number of books and the complicated system of bookkeeping kept by the bank, and the artful manner in which its insolvency was and had been secreted by its officers, no one except the officers having knowledge of its condition could or would have supposed from any investigation made within any reasonable limit of time that the bank was insolvent, or that any bills receivable were fictitious, fraudulent or dead paper, or that any of the representations made by the president of the bank were false and untrue, or that it was the purchaser of a large amount of its own stock.

On or about December 2, 1896, there were rumors of the insolvency of the bank. Immediately after learning of such rumors the defendant began to make the most diligent efforts to ascertain the cause thereof, and to ascertain its actual condition. During such investigation, which was only a day prior to the bank's suspension, its president, cashier and other officers persistently insisted that it was in a good, healthy financial condition, and was perfectly solvent, as they had represented it to be. But the defendant was unable to ascertain at that time any information showing the real and actual condition of the bank beyond the representations of its officers.

On the 3d of December, 1896, the receiver of the bank appointed by the Comptroller of the Currency took the actual and exclusive control and possession of the bank and its assets, books, papers and records, and excluded every one, including the officers of the bank and the defendant from the right or opportunity of making any inspection of such books, records, papers or assets. Although repeatedly requested to give to the defendant and his associates an opportunity of making a careful and complete investigation of the affairs and condition of the bank after the same had passed into the possession of the plaintiff as

such receiver, the latter persistently refused and denied such request, and after the bank was placed in the hands of the receiver the defendant called upon him and demanded access to the books, papers and documents of the bank, there being no other source from which he could ascertain the real history of the bank and its business transactions or its real condition. He frequently called upon the receiver and asked him for information as to its real history and actual condition, but the only information he could get from that officer was that the bank was solvent and under his management would pay all of its debts, liabilities and obligations without making any assessment or call upon the stockholders. The receiver continued to make the statement that the bank was in a solvent condition, up to the time the order of assessment was issued by the Comptroller as alleged in the petition. By reason of the statements and representations made by the receiver the defendant was led to believe and did believe that the bank was solvent and would pay all its obligations, and that its embarrassments were due to the complication of business matters and would only be temporary.

The defendant also alleged in his answer that on or about September 1, 1897, upon repeated requests, the Comptroller gave to defendant and his associate Hood permission to inspect the assets, books and records of the bank, and to secure all information possible as to its actual condition, and also permission to see the reports of the examinations made under the direction of the Comptroller and the receiver; and that thereupon for the first time after the appointment of the receiver the defendant was permitted to and did make a careful and thorough examination into the actual condition and affairs of the bank; that as a result of that investigation defendant for the first time ascertained the actual condition of the bank and its affairs, and for the first time learned that the representations made by Rieger about its condition were knowingly false, fraudulent and untrue, and were made by him as president of the bank with full knowledge of the bank and the directors and the managers thereof that they were false, fraudulent and untrue and for the purpose of inducing the defendant and Hood to invest in the capital stock of the bank;

That at no time after its organization in 1891 was the bank solvent or able to meet its debts; that no part of its original capital stock was ever actually paid for, as required by the banking laws, nor was any part of the reduced capital stock of $250,000 ever paid for; that the stock had in many instances been issued to irresponsible parties and worthless notes taken therefor; that at the time the bank was represented by Rieger to be in good, sound financial condition it had on hand and included as part of its good assets fraudulent, fictitious and worthless paper greatly in excess of its capital stock; that there was at the time fraudulently concealed and covered up, in paper represented to be good, $50,000 of Rieger's personal indebtedness absolutely worthless; and that the bank never from its organization earned a dividend, but had paid out on dividends over $70,000 in order to conceal and cover up its actual condition; that Rieger when he made the above representations knew the stock to be absolutely worthless and that the capital stock had never been properly issued or paid for; that a large portion of the stock was claimed to be owned by the bank, and that the bank had on hand notes and paper that were fraudulent, fictitious and worthless in a greater amount than its entire capital stock; and that with full knowledge of its absolutely insolvent condition he represented the bank to be in good condition in order to induce defendant to purchase the two hundred shares of the capital stock and defraud him of the $20,000; that at the time of such purchase the defendant believed the statements made to him to be absolutely true in every particular, and was governed by them in such belief; but that such stock was not at any time of any value whatever;

That by reason of the facts above stated and set forth no consideration was ever received by the defendant from the bank for the payment of the $20,000 at the time of the purchase of said stock;

That immediately after the investigation permitted by the Comptroller, and on or about the 27th of October, 1897, he called at the banking house of the bank, where its affairs were being adjusted by the receiver, but finding only the receiver in possession and custody of the bank, its assets, books, records

and affairs, and being unable to find any officer of the bank, he tendered to the receiver said certificate of stock numbered 611, above referred to, for cancellation, notifying and informing him that because of the fraud and deceit that had been practiced upon him, he disaffirmed the contract of purchase or pretended purchase of stock, and demanded that the receiver receive the certificate, cancel it and repay to the defendant the sum of $20,000 paid by him as above stated, or such proportionate part thereof as he would be entitled to receive as a creditor of the bank for that amount; but such tender and demand the receiver refused to accept or accede to; and,

That, from the time the bank went into the hands of the receiver until the filing of the answer, there had not been any officer of the bank living or residing in Missouri upon whom any service of summons or other process could be had in any suit that might have been commenced against the bank in Missouri, save and except only the receiver as representing the bank, and that since December 3, 1896, the bank had no usual place of business whatever in Missouri where process could be left or served upon any person conducting the bank's business, save and except as process might be served upon the plaintiff as such receiver.

For a second and further defence the defendant alleged that prior to and during the negotiations with him and Hood, the president, cashier and other officers of the bank, knowing well its insolvency, purchased or pretended to purchase from stockholders or alleged stockholders, with the funds of the bank, shares of its outstanding capital stock in order to prevent exposure by the stockholders owning such shares of its actual condition and the threatened throwing of such shares on the market at prices that would advertise the bank's insolvency; that in order to prevent an open and apparent violation of law, as well as to deceive the public and the Comptroller of the Currency and his associates and employés, the officers of the bank engaged in this transaction and in transactions of buying or attempting to buy such shares of its own stock so outstanding, would cause the certificates of stock purchased or pretended to be purchased from the parties holding the same to be en-

dorsed by those to whom the certificates were issued, either in blank or in the names of the president, cashier or some one of the clerks or other parties connected with the bank, and would then procure a delivery of such endorsed certificate, paying for the same with money belonging to the bank, or by surrendering notes held by it against such parties for such stock, or by payment of money and surrender of notes; that then to account for the funds so used, the parties to whom the certificates would be assigned, or whom the bank pretended were the owners of them, would make a promissory note or notes to the bank for the amount of money used in the purchase of such stock, such note or notes being payable to the bank and unsecured except as the certificates of stock were issued to secure the same; that all stock purchased or attempted to be purchased by the officers of the bank was paid for out of its funds and notes taken from its officers, agents and servants to the bank to represent the funds so used;

That each and every one of the persons engaged in this transaction and who executed any or all of the notes referred to was at the time and ever since had been absolutely and hopelessly insolvent, to the full knowledge of every officer of the bank engaged in these transactions; that such pretended or attempted purchase of shares of stock was made by the bank directly with the owners or holders thereof and with the people in whose names the stock stood, to the knowledge of each one of the persons owning or holding the stock or in whose name it stood, and that none of the transactions concerning the negotiations for the pretended purchase of stock was made to or with the owners, holders or the persons in whose names it stood by any employés in whose names the certificates were taken or to whom the certificates were delivered in blank, except in the case of the president and cashier, who in such negotiations and pretended purchases were, to the knowledge of those with whom they dealt, acting for and on account and in the name of the bank;

That in some instances, and perhaps all, the certificates of stock surrendered to the bank were cancelled, and new certificates issued to irresponsible persons, who were to hold the

same for the use and benefit of the bank; that owing to the fact that the entire history of these transactions, so far as it appeared in writing, was and is contained in the books, records and papers of the bank in the sole custody of the receiver, the defendant was unable to give a more detailed statement and history of the transactions, or to state from whom all the purchases were made, or to whom certificates were assigned, or by whom held, or to whom they might have been transferred;

That none of said stock was taken or purchased or procured by the bank to prevent any losses or loss upon debts previously contracted in good faith or purchased in any way authorized by law, but the same was purchased by the bank with its funds for the purpose of preventing the stock from being sold in open market, and to prevent any investigation being made as to the actual condition of the bank by the parties owning the same; that none of the parties to whom new certificates of stock were issued have paid anything for it, nor did they pay or cause to be paid the notes executed to the bank, nor did they intend to pay the notes when they were executed, because they were executed with the fraudulent purpose of concealing the stock purchased by the bank;

That at the time of the negotiations for the purchase of said stock, and at the purchase thereof, the bank had purchased with its funds, in the manner set forth, about $80,000 of the $250,000 of the reduced capital stock of the bank;

That during said negotiations with the president and other officers of the bank by the defendant and Hood, and at the time of the purchase of said stock, the president and other officers of the bank represented to them that all of its capital stock had been subscribed for and issued to actual purchasers in good faith, and was then held and owned by such parties as stockholders of the bank, except an amount of the capital stock which the bank then had on hand which had been taken in by it to prevent a loss on indebtedness previously contracted in good faith, and had been so taken without violating the banking laws of the United States; that defendant believing those statements purchased of the bank two hundred shares of its capital stock

of the par value of $20,000, which sum he paid therefor, and a certificate was issued to him by the bank; and,

That at the time of the purchase or attempted purchase by him of said stock for which the certificate was issued, the president and other officers of the bank, in order to have its books show correctly the amount of the outstanding stock, caused some or all of the parties who held certificates of stock in their names that had been purchased for and on account of the bank to surrender to the bank enough of such certificates for cancellation, so that the certificate issued to the defendant could be issued therefor and in the place thereof, and immediately upon the surrender of such certificates to the officers of the bank, and without the knowledge of the defendant, the certificates were cancelled by the bank to an amount sufficient to enable it to issue the certificate so received by defendant; and that the parties who held said stock never at any time received the purchase money paid by the defendant for it, but the same was retained and kept by the bank. Wherefore defendant demanded that the action be dismissed.

The defendant also filed a cross-petition and counterclaim, incorporating therein by reference all the allegations of his first and second defence. He alleged that by reason of the facts stated and the fraud and deceit practiced upon him by the bank and its officers, he has been damaged in the sum of $20,000, with interest from April 18, 1896. He further alleged that he had presented such claim to the receiver for allowance as a claim against the bank, and that the same had been rejected and refused by the receiver. He therefore prayed judgment against the bank for the above sum with interest, and asked that the same be paid ratably by the receiver out of the assets and funds of the bank in his control and possession.

We have given a full statement of the averments of the defendant's pleadings because in an attempt to condense them something might be omitted that was deemed by the plaintiff in error essential to his case, and because the questions presented for consideration may be regarded as important.

Assuming that the defendant became a shareholder in conse-

quence of the fraudulent representations of the bank's officers, as set forth in the answer and cross-petition or counterclaim, two principal questions are presented for determination : 1. Whether such representations, relied upon by the defendant, constituted a defence in the present action brought by the receiver only for the purpose of enforcing the individual liability imposed by section 5151 of the Revised Statutes upon the shareholders of national banking associations. 2. Can the defendant, because of the frauds of the bank whereby he was induced to become a purchaser of its stock, have a judgment against the receiver on the counterclaim in this action for the money paid by him for stock, to be satisfied out of the bank's assets and funds in his control and possession ?

The present action is beyond question one at law. Its object is to enforce a liability created by statute for the benefit of creditors who have demands against the bank of which the plaintiff is receiver. The defendant stood upon the books of the bank as a shareholder at the time it was placed in the hands of the receiver and he was accorded the privileges appertaining to that position. He claims exemption from the responsibility attaching to him, under the statute, as a shareholder upon the ground that in consequence of the frauds practiced upon him he was entitled to disaffirm, and that he had upon due notice to the receiver disaffirmed, the contract under which he purchased the stock in question. He seeks to have the certificate received by him treated as cancelled. Clearly such a defence is of an equitable nature, and could not be recognized and sustained except in some proceeding to which the bank, at least, was a party. If the defendant was entitled, under the facts stated, to a rescission of his contract of purchase, and to a cancellation of his stock certificate, and consequently to be relieved from all responsibility as a shareholder of the bank, he could obtain such a relief only by a suit in equity to which the bank and the receiver were parties.

The defendant alleges that he tendered to the receiver the certificate of stock received by him for cancellation, notifying and informing the latter that, because of the fraud and deceit practised upon him by which he was induced to purchase or

attempt to purchase the stock represented by the certificate, he disaffirmed the contract of purchase or pretended purchase of the stock, and demanded that the receiver receive the certificate and cancel it and repay the sum of twenty thousand dollars paid by him, or such proportionate part thereof as he would be entitled to receive as a creditor of the bank for that amount, which tender and demand the receiver refused to accept or accede to. Such tender was an idle ceremony and added nothing to the rights of the defendant; for the receiver had no power to accept or cancel the certificate or to relieve the defendant from the responsibility attaching to him as one appearing upon the books of the bank as a shareholder and to whom had been accorded by the bank the privileges of a shareholder. His duty was to take charge of the assets of the bank and to enforce such assessment upon shareholders as was made by the Comptroller in virtue of the statute.

Nor could the bank, after its suspension and the appointment of a receiver, have assumed to discharge the defendant from any liability attaching to him as a shareholder. Upon the failure of the bank the rights of creditors attached and could not be affected by anything that the bank or its officers might, after such failure, have done or omitted to do. In *Earle* v. *Pennsylvania*, 178 U. S. 449, 455, we held that when a national bank suspends and is placed in the hands of a receiver the entire control and administration of its assets are committed to the receiver and the comptroller, subject to whatever rights of priority, if any, may have been previously acquired by proceedings lawfully instituted against the bank before its suspension. So that the only way in which the defendant could have effectively raised the question of his liability as a shareholder, arising from frauds committed by the bank or its officers before its suspension whereby he was induced to become a shareholder, was by a suit in equity against the bank and the receiver. Instead of pursuing that course, he sought by interposing an equitable defence to defeat this action at law brought by the receiver under the statute. That cannot be done, because under the Constitution of the United States the distinction between law and equity is recognized, so that in actions at law in a Circuit

Court of the United States equitable defences are not permitted. So, also " if the defendant," this court has said, " have equitable grounds for relief against the plaintiff, he must seek to enforce them by a separate suit in equity." *Northern Pacific Railroad* v. *Paine,* 119 U. S. 561, 563. See also *Bennett* v. *Butterworth,* 11 How. 669; *Thompson* v. *Railroad Companies,* 6 Wall. 134; *Scott* v. *Neely,* 140 U. S. 106; *Scott* v. *Armstrong,* 146 U. S. 499, 512.

We must not be understood as expressing any opinion upon the question whether the defendant could have been discharged from liability as a shareholder if the facts stated in his answer by way of defence had been established in a separate suit in equity. Whether a decree based upon the facts set forth in the answer, even if established in a suit in equity brought against the bank and the receiver after the appointment of a receiver, would be consistent with sound principle or with the statute. regulating the affairs of national banks and securing the rights of creditors, is a question upon which we do not now express an opinion. We mean at this time only to adjudge that the facts set forth in the answer present grounds of relief which cannot be made. available by way of defence in this action at law, and if sufficient to protect the defendant against the liability attaching to him as a shareholder, must be alleged and proved in a suit in equity to which the bank and the receiver are made parties.

Some of the observations made in *Scott* v. *Deweese,* 181 U. S. 202, are quite applicable to the present case. That was an action at law to enforce the individual liability imposed by section 5151 of the Revised Statutes. The defendant in that case sought to escape such liability upon the ground, in part, that he had been induced by false representations of the bank's officers to accept a certificate for a certain amount of its increased capital stock. No suit had been instituted to cancel the certificate or to rescind the subscription of stock. The court said: " The present suit is primarily in the interest of creditors of the bank. It is based upon a statute designed not only for their protection but to give confidence to all dealing with national banks in respect to their contracts, debts and.

engagements, as well as to stockholders generally. If the subscriber became a shareholder in consequence of frauds practiced upon him by others, whether they be officers of the bank or officers of the Government, he must look to them for such redress as the law authorizes, and is estopped, as against creditors, to deny that he is a shareholder, within the meaning of section 5151, if at the time the rights of creditors accrued he occupied and was accorded the rights appertaining to that position." Whether the defendant in that case could have been relieved from liability as a shareholder and had his subscription of stock cancelled, if he had in good faith and in due time before the suspension of the bank instituted proceedings to obtain relief, was not decided.

The defendant, however, contends that the present suit is not embraced by the rule just announced because, he insists, the purchase by the bank of its stock—which he was induced thereafter by its fraud to purchase from it—was not simply voidable but was absolutely *void;* consequently, the sale to him of such stock was void and he did not by his purchase and by taking a certificate of stock become a shareholder within the meaning of section 5151.

It is true that the statute declares that no national bank shall be the purchaser or holder of any of its own shares of capital stock. Rev. Stat. § 5201. But will a violation of this provision by the bank relieve from liability one who holds a certificate of its stock and enjoys the right of a shareholder?

The statute forbids a national bank to lend money upon real estate as security. Rev. Stat. § 5137. Nevertheless, this court has frequently held that the borrower cannot escape liability for the repayment of the money so borrowed, nor dispute the right of the bank to enforce the security taken in violation of the statute; that it was for the Government and not for the borrower to complain of the bank's departure from the rule prescribed by statute. *Scott* v. *Deweese,* 181 U. S. 202, and authorities there cited.

In *National Bank* v. *Stewart,* 107 U. S. 676, 677, it appeared that a bank had loaned money on the security of its shares of stock held by the borrower. The debt not having been paid,

the bank sold the stock and applied the proceeds to the payment of an equal amount of the debt. The stockholder then sued the bank to recover the value of the stock, relying on section 5201 of the Revised Statutes forbidding a national bank to make any loan or discount on the security of the shares of its own capital stock. The trial court held that as the statute forbade the bank to accept its own shares of stock as security for money loaned, the plaintiff was entitled to recover. The judgment was reversed by this court, which held that the statute imposed no penalty, either on the bank or borrower, if a loan was made in violation of its provisions; and that if the prohibition could be urged against the validity of the transaction by any one except the Government, it could only be done while the security was subsisting in the hands of the bank.

So in *Scott* v. *Deweese* above cited, which involved a construction of section 5205 providing that no increase of a bank's capital stock shall be valid until the whole amount of such increase shall have been paid in, and until the Comptroller certifies that the amount of the increase has been duly paid in as part of the capital of the association. This court said: "The statute does not, in terms, make *void* a subscription or certificate of stock based upon increased capital stock actually paid in, simply because the whole amount of any proposed or authorized increase has not in fact been paid into the bank. . . . That the bank, after obtaining authority to increase its capital, issued certificates of stock without the knowledge or approval of the Comptroller and proceeded to do business upon the basis of such increase before the whole amount of the proposed increase of capital had been paid in, was a matter between it and the Government under whose laws it was organized, and did not render void subscriptions or certificates of stock based upon capital actually paid in, nor have the effect to relieve a shareholder, who had become such by paying into the bank the amount subscribed by him, from the individual liability imposed by section 5151."

In view of these decisions it cannot be held that the purchase by the bank of its own shares of stock was void. It was of course a matter of which the Government by its officers could

take cognizance; and it may be that it was a matter of which stockholders, having an interest in the proper administration of the affairs of the bank, could complain in a proceeding instituted by them to restrain the bank from violating the statute. But, when the violation of the statute has occurred, it is not a matter of which a shareholder can complain in order that he may be relieved from the liability attaching to him as a shareholder and which the receiver seeks to enforce under the orders of the Comptroller. In the present case Judge Thayer, delivering the opinion of the Circuit Court of Appeals, well said: "In considering the second defence which was interposed by the defendant, it is important to bear in mind that the two hundred shares of stock which he purchased from the bank was not void stock, but was stock which, according to the averments of the answer, had once been issued to other persons and had been reacquired by the bank by purchasing it from such other persons to prevent them from throwing it on the market at ruinous prices. It is necessary to infer from the averments of the answer that this stock had once passed the scrutiny of the Comptroller, and had been outstanding and had been held by other persons since the organization of the bank in the year 1891. The purchase of this stock by the bank under the circumstances disclosed by the answer was doubtless *ultra vires*, but the purchase in question did not render the stock void. In purchasing it the bank made an unlawful use of its funds, for which the officers concerned in the transaction could have been held responsible, as for any other unlawful act, if the corporation had sustained damage; but in point of fact, by the sale of the stock to the defendant that portion of its capital which had been dissipated by the purchase was restored by the resale, and no loss seems to have been incurred. We are at a loss to understand how this transaction on the part of the bank can operate to relieve the defendant from his liability as a stockholder in a suit brought by the receiver to recover a stock assessment which was levied solely for the benefit of corporate creditors. The sale of the stock to the defendant after the bank had purchased the same was not unlawful, since it operated to restore that part of the capital that had been retired, and to that ex-

tent repaired the wrong which might otherwise have been done to the bank's creditors." 97 Fed. Rep. 865, 868.

It only remains to inquire whether, in any view of the case, the cross-petition or counterclaim can be sustained. We think not. The receiver sued in this case for the benefit of creditors who, it must be assumed upon this record, knew nothing of the circumstances under which the defendant became a shareholder. They trusted the bank and those who appeared on the list of shareholders required to be kept by section 5210 of the Revised Statutes, which list, that section declares, "shall be subject to the inspection of all-the shareholders and creditors of the association." Referring to that section, this court, in *Pauly* v. *State Loan & Trust Co.*, 165 U. S. 606, 621, 622, said: "Manifestly, one, if not the principal, object of this requirement, was to give creditors of the association, as well as state authorities, information as to the shareholders upon whom, if the association becomes insolvent, will rest the individual liability for its contracts, debts and engagements." *Pullman* v. *Upton*, 96 U. S. 328, 330, 331; *National Bank* v. *Case*, 99 U. S. 628, 631. "It is true that one who does not in fact invest his money in such shares, but who, although receiving them simply as collateral security for debts or obligations, holds himself out in the books of the association as the true owner, may be treated as the owner, and therefore liable to assessment, when the association becomes insolvent and goes into the hands of a receiver. But this is upon the ground that by allowing his name to appear upon the stock list as owner he represents that he is such owner; and he will not be permitted, after the bank fails and' when an assessment is made, to assume any other position as against creditors. If, as between creditors and the person assessed, the latter is not held bound by that representation, the list of stockholders required to be kept for the inspection of creditors and others would lose most of its value."

We perceive no ground whatever upon which the defendant can have a judgment upon his cross-petition or counterclaim against the receiver. That officer had nothing to do with the fraudulent transactions of the bank prior to its suspension. His duty was to take charge of its assets, and have them admin-

istered according to the rights of parties existing at the time of such suspension. Whether, if the defendant claimed a judgment against the bank or its officers for the alleged fraud or deceit of the latter officers, he could participate in the distribution of the proceeds of the stock assessment until all the contract obligations of the bank had been met, was not decided by the Circuit Court of Appeals. That question was wisely reserved for decision when it should arise and become necessary to be decided. It was deemed by that court only necessary to adjudge that the receiver was entitled to a judgment against the defendant, and that the latter was not entitled in this action to a judgment against the receiver on account of frauds committed by the bank or its officers. In that view we concur.

Perceiving no error of law in the record, the judgment below is

*Affirmed.*