**CHAPMAN, Commissioner of Banking, v. HARRIS et al. (No. 6823.)**

(Court of Civil Appeals of Texas. Austin. May 6, 1925. Rehearing Denied July 6, 1925.)

1. **Banks and banking** ⊜⟿49(8)—**Evidence held to conclusively show that defendant was stockholder of bank.**

In suit by commissioner of banking to recover assessment on shares of stock, evidence *held* to conclusively show that defendant was a stockholder.

2. **Banks and banking** ⊜⟿48(1)—**Unauthorized hypothecation of certificate of stock held not to affect subscriber's status as stockholder.**

Unauthorized hypothecation of certificate of stock to secure obligation of bank, *held* not to affect subscriber's status as stockholder.

3. **Banks and banking** ⊜⟿49(8)—**Evidence held to show that fraudulent representations as to financial condition of bank were made by officers thereof and in their official capacity.**

In suit by commissioner of banking to recover assessment on shares of stock, evidence *held* to show that alleged fraudulent representations as to the financial condition of the bank by officers thereof were made in their official capacity.

4. **Banks and banking** ⊜⟿49(9)—**Whether alleged fraudulent representations as to condition of bank were expressions of opinion and representations of fact held question for jury.**

In action by banking commissioner to recover assessments on shares of stock, whether alleged fraudulent representations by officers as to financial condition of bank were representations of fact or expressions of opinion *held* question for jury.

5. **Banks and banking** ⊜⟿47(1)—**Subscribers to suit of bank cannot defeat liability as against subsequent creditors by proof of fraud in contract of subscribers.**

Subscriber to capital stock of a bank cannot, as against subsequent creditors, defeat liability as stockholder for illegality or fraud in contract of subscription.

6. **Banks and banking** ⊜⟿49(8)—**Burden of proving fraud in subscription contract for bank stock is on alleging party.**

In action by bank commissioner to recover assessment on stock, where it was contended by subscriber that he was induced, by fraudulent representations by officers as to the financial condition of bank, to enter subscriptions, *held*, burden of proof was on subscriber to show every fact essential to establish fraud.

7. **Banks and banking** ⊜⟿49(8)—**Burden is on subscriber to stock, alleging fraud in contract of subscription, to prove that rights of creditors accrued prior to time he became stockholder.**

In action by bank commissioner to recover assessment on stock, where it was contended by subscriber that he was induced, by fraudulent representations by officers as to the financial condition of bank, to enter subscriptions, *held*, burden was on subscriber to show that rights of creditors had accrued prior to time he became a stockholder.

8. **Appeal and error** ⊜⟿842(1)—**Whether subscriber to bank stock was estopped by laches to rescind contract of purchase held question of fact.**

Whether subscriber to bank stock, in action by banking commissioner to recover assessment was estopped by his laches to rescind contract to purchase on ground of fraud, *held*, under evidence, question of fact.

9. **Banks and banking** ⊜⟿49(8)—**Alleged fraudulent representations as to financial condition of bank held properly admitted.**

In action by commissioner of banking to recover assessment on stock, alleged fraudulent representations as to the financial condition of

the bank by officers *held* properly admitted, as against contention that representations were made by officers in their individual capacity.

**10. Banks and banking @=>47(1)—Alleged statement of bank officers as to financial condition of bank held to constitute representations of fact.**

Alleged statements of bank officers that loans of bank were good and collectable, and that stock was worth certain amount, *held* representations of fact.

**11. Banks and banking @=>49(8)—Testimony of financial condition of bank subsequent to issuance of certificate to defendant held improperly admitted.**

In action by banking commissioner to recover assessment on stock, testimony concerning financial condition of bank and certain losses of bank subsequent to subscriber's purchase of stock *held* improperly admitted.

**12. Evidence @=>158(26), 383(6)—Books of bank evidence of assets and liabilities, but not conclusive, and subject to contradiction.**

Books of bank are best evidence of assets and liabilities, but are not conclusive, and are subject to contradiction by one who has personal knowledge of facts.

**13. Banks and banking @=>49(8)—Stockholder may show that items of doubtful collectability held at time of subscription were thereafter lost.**

In suit to enforce stockholder's liability, defended on ground that his subscription was obtained by fraudulent representations, where it is shown that bank had certain items that were uncollectable, or of doubtful collectability, at time stockholder subscribed, it is competent to show that items were thereafter lost by bank.

Appeal from District Court, Comanche County; J. R. McClellan, Judge.

Action by J. L. Chapman, Commissioner of Banking, against Merton L. Harris and others. From a judgment for defendants, plaintiff appeals. Reversed and remanded.

Smith & Woodruff, of Comanche, for appellant.

Gib Callaway, of Dallas, for appellees.

McCLENDON, C. J. The appellant, J. L. Chapman, in his capacity as state banking commissioner, instituted this suit against appellee Merton L. Harris, to recover the sum of $2,000, the amount of a 100 per cent. assessment upon 20 shares of the capital stock of the First State Bank of De Leon, which bank had become insolvent and had been taken over by the banking commissioner for the purpose of winding up its affairs. Appellee, in addition to a general demurrer and general denial, specially pleaded that, if he was a stockholder (a fact which he denied), he was fraudulently induced to become such by representations of B. L. Terrell and C. E. Kenyon, president and vice president of the bank, respectively, who acted both for themselves and the bank in procuring him to become a subscriber to its stock. The allegations of fraudulent representations may be thus briefly stated:

The bank was about to double its capital stock, and the officers named, being the owners of 10 shares, upon which there was to be a 100 per cent. stock dividend, induced appellee to purchase it, and had the 20 shares issued to him for the sum of $3,000, represented by his promissory note, upon representations that the stock was at that time worth three for one; that the bank was in sound and safe condition, and had no bad loans and no bad papers; that all its outstanding notes were good and collectable, and would be collected when due; and that said officers represented to him that, if he would purchase the stock, they would elect him a director, to the end that he might assist in looking after the affairs of the bank. The necessary allegations were made as to the falsity of these representations, the bank's insolvency, appellee's belief and reliance upon the representations, and his being thereby induced to purchase the stock. By trial amendment appellee alleged that he never became a stockholder of the bank, in that at the time he agreed to purchase the stock it was hypothecated, and so remained until after the bank closed, and was never delivered to him.

By supplemental petition appellant urged various exceptions to the answer, which raised substantially the same questions presented under requests for peremptory instructions and objections to evidence and to the judgment, and specially pleaded estoppel to set up any fraud as against the banking commissioner, in that appellee held himself out as a stockholder and exercised the rights and privileges as such, and further that he waived his right to rescind his contract of purchase by failing to exercise it in a reasonable time after he knew or should have known of the fraud, and by thereafter participating in a stockholders' meeting.

The case was tried to a jury upon a general charge, which eliminated every question in the case except the issue of fraud. Upon the jury's verdict judgment was rendered in favor of appellee, and from this judgment the banking commissioner has appealed.

Appellant presents 17 assignments of error, which present in one form or another the following contentions:

(1) That the fraudulent representations relied upon were made by the officers of the bank individually, and not in their representative capacity, and were therefore not available as a defense in a suit by the commissioner of banking upon a stock assessment.

(2) That the fraudulent representations were merely expressions of opinion and not

representations of fact, and were therefore not actionable.

(3) That the fraudulent representations were in no event available as a defense in a suit of this character as to creditors who had become such during the time appellee was a registered stockholder of the bank, and the burden of allegation and proof was on appellee to show that no creditor became such during such period.

(4) That appellant was estopped by his laches to rescind his purchase.

(5) That evidence of the bank's financial condition subsequent to the alleged fraudulent representations were not admissible in evidence, where, as shown in this case, the financial condition of the bank had in the meantime changed.

(6) That the best evidence of the bank's financial condition was the books of the bank, which were not introduced in evidence, and parol evidence was therefore not admissible for this purpose.

Appellee, in addition to contesting the several propositions thus urged, contends that the evidence conclusively showed that he never was a stockholder of the bank, and that whatever error the trial court may have committed was thereby rendered harmless, in that the judgment rendered was the only judgment which the evidence would support. The record shows that, some time prior to July 1, 1920, appellee entered into a contract with Terrell and Kenyon to purchase 20 shares of the bank, made up of 10 shares then owned by them and 10 shares represented by a 100 per cent. stock dividend, which had been authorized by the officials of the bank and the banking commissioner.

Appellee testified that this contract was made under substantially the following circumstances: That some time in the spring of 1920 Kenyon approached him with the idea of selling him the stock, and a few days later he was also approached by Terrell. The condition of the bank was fully discussed, and Terrell told him—

"the bank was in good shape, and that the loans of the bank were practically all good and collectable, and that the bank stock was worth about 308 or 309 at that time." "At that time I told Kenyon that, if they would elect me a director of the bank, so that I could have a say-so in directing the affairs of the bank, I would be glad to buy, but that I didn't have the money with which to buy the stock. He said that was all right; that they would be glad to take my note for the stock, and I agreed to purchase the stock under these conditions; they were contemplating increasing the stock of the bank at that time."

He gave his note for $3,000, which was never surrendered to him or presented for payment. After the capital stock had been increased, Terrell told him that the stock could not be delivered, because it was up as collateral for money borrowed by Kenyon

and Terrell, and the certificate was never delivered to him, and he never saw it. He had already signed the note. He testified to several subsequent conversations with Terrell or Kenyon, in each of which the same statement was made as to hypothecation of the stock. He further testified:

"We had this kind of a conversation at the time we made the deal: They said at the time, whenever it was delivered to me, they wanted to take it back, and perhaps would want to hold it as collateral on my $3,000 note to them, and I told them that would be satisfactory. I never did indorse my certificate over to them to hold on my debt as collateral. I am sure I never did, and I never did authorize them to indorse my stock certificate and put it up as collateral. I never did authorize them to sign my name and put it up as collateral. They never did request me to authorize them to put the stock up as collateral. They never did get my permission to put my stock up on their debts."

The first time he ever mentioned disaffirming the trade was some four or five months before the stockholders' meeting of September 21, 1921, in a conversation with Terrell detailed by him as follows:

"I don't remember the exact day; it had been quite a long time, and I called his attention to the fact of the representations he and Kenyon had made and promised, and told him that they had not been carried out, and I felt like he should rescind the trade, and in a nice way to him, I told him I was rescinding it. I might not have used those words, but in a way I told him I was rescinding that trade, and then later on I attended this stockholders' meeting."

The stock certificates were not introduced in evidence, but the stock certificate ledger showed appellee as the owner of the 20 shares in question, issued July 1, 1920, and under the heading "Last Owner," the following:

"Kenyon & Terrell, 10 shares; stock dividend, 10 shares."

Stock certificate stub No. 44 reads:

"Certificate No. 44. For 20 shares issued to Merton L. Harris. Dated July 1, 1920. From whom transferred: C. E. Kenyon & D. L. Terrell 10 sh. Stock dividend 10 sh. Dated Mar. 9, 1920. No. Original Certificate 31. No. Original shares 10. No. of shares transferred 10. Stock dividend 10. Received certificate No. 44 for twenty shares this 8th day of July, 1920. —————————."

There was a conflict in the testimony regarding the representations made to appellee when he agreed to purchase the stock, but it is not necessary to set it out. Terrell testified with reference to the agreement with Harris under which the stock was purchased:

"I don't remember whether it was delivered personally by him or not. I think the stock was issued later, but it was agreed at the time the note was signed that this stock was to be placed as collateral, and that was later done."

He further testified that at the time he sold the stock to appellee it was held in Fort Worth as collateral for a loan of himself and Kenyon, and that:

"Mr. Bolton (the cashier) delivered the stock certificates to him. I know that to be a fact. The reason we did not take his receipt on the stock certificate book was we just overlooked it. We took receipts for the other stock sold.

"Q. Just refresh your memory, and see if you don't remember that you never did deliver the stock to him. A. Yes, sir; I or Mr. Bolton, one, delivered it to Mr. Harris. It is not a fact that after the 20 shares of stock was issued that we put them back up with the people that the 10 shares were up with, and it is not a fact that those 20 shares of stock, at the time the bank went broke, were still up. We put them up with somebody else. * * *

"Q. That obligation is still unpaid, and the stock is up as collateral? A. Yes, sir; I suppose they still hold it, unless they have thrown it in the waste basket. I never got it back."

The corporate minutes showed that a stockholders' meeting was held on September 21, 1921, at which appellee was personally present, representing his 20 shares and voting 54 other shares as proxy. At this meeting a resolution was unanimously passed to the effect that the business of the bank be closed and all depositors and creditors paid in full, the remaining assets distributed proportionately among the stockholders, and the bank's corporate franchise canceled and surrendered; that the board of directors be authorized to waive the three months' notice to the depositors of the adoption of this resolution, and directed to take all necessary steps and execute all necessary papers to carry it into effect, either by direct liquidation or consolidation, and sell all the assets to any other banking association with the approval of the department of insurance and banking. Terrell testified that this meeting was really called by Mr. Thomas, the representative of the banking department, and that:

"The real purpose of that meeting was the selling out to another bank at that time. It was claimed by the banking department that the First State Bank of De Leon was insolvent at that particular time, and they claimed that it was still insolvent at that time, and that meeting there was to legally put it in shape so that the bank could be sold out to another; that was the purpose of that meeting. The board of directors never did sell the bank under that order. What was read in that order was carried out, but the examiner never did make any deal. He was to make the deal; he was chairman. He was the whole cheese."

With reference to this stockholders' meeting appellee testified:

"They came to get me; sent for me in the first place, I didn't go, and I believe Thomas came. He was a representative of the department, and had a talk with me, and I don't know, some of the reasons was he said it was very necessary that I attend the meeting; that they were fixing to sell out the bank, and it became necessary for all of the stockholders to join in before it could be sold, and I told them I didn't consider myself a stockholder, and Thomas said, 'Well, your name shows on the records over there as being a stockholder, and the department will not recognize any trade or transaction without all of the stockholders joining in.' I went ahead in that same conversation and told Thomas about the fraud that had been perpetrated on me, and I didn't think under the circumstances, and didn't believe, I was a stockholder of the bank, and that I repudiated any kind of a contract that had been made between Terrell and Kenyon and myself, and that it had been made through fraud and misrepresentation. He said, 'We have got a chance to sell the property of the bank,' and said he felt like it was the proper thing to do, and that I must come over to the stockholders' meeting and participate. And I told him there was only one way I would participate in the meeting, and that was under a protest and understanding that anything that had gone before this would not be affected by this transaction in the stockholders' meeting, and I went over with that understanding. When I got over there I called Terrell off, and went in the bank with Terrell and myself alone, and I had a talk with him for some 30 minutes, and went over the same things with him, and told him I repudiated the contract, and that he and Kenyon knew what they had agreed with me, and they had failed to comply with those representations made to me, and that I rescinded the contract, and that he was the one that was liable; and then Thomas spoke up and said, well, I had to participate; and I said, 'I will under the conditions I told you and Terrell.'"

Appellee was a practicing attorney, and he and his firm had represented the bank in legal matters, but he testified that he knew nothing of its financial condition. The evidence with reference to the financial affairs of the bank, in so far as pertinent to the questions involved, will be stated later.

[1, 2] We overrule appellee's contention that the evidence conclusively shows that he was never a stockholder of the bank. In our judgment, the evidence is not only sufficient to support a finding that he was a stockholder, but warranted eliminating this issue altogether. Disregarding the evidence of Terrell, and taking plaintiff's testimony alone, we think it conclusively appears that he was a stockholder. Under the contract detailed by him he agreed to purchase the stock, giving his note for the amount, which was to be secured by the stock as collateral. Assuming that the certificate never in fact came into his hands, and was never indorsed by him, it was issued in his name, and Kenyon and Terrell had authority to hold it as collateral security for appellee's note. When the certificate was issued under these circumstances, we think appellee became a stockholder, in so far as the corporation and its creditors were concerned. Its attempted hypothecation to secure an obligation other than appellee's note, without appellee's authority, either express or implied, was not

binding upon appellee, since the certificate was in his name, and was not indorsed by him, and was merely an unwarranted exercise of authority over the certificate by Kenyon and Terrell. It in no way affected appellee's status as a stockholder. We think it also conclusively appears that he was a stockholder, from the fact that several months before the meeting of September, 1921, he attempted to rescind his purchase on the ground of fraud, and later at the stockholders' meeting reiterated his right to rescind, and attended and participated in the stockholders' meeting under protest and the reservation of that right to rescind on the ground of fraud. At neither of these times did he make any claim that he had not authorized the issue of the certificate in his name, or that it had not been delivered to him. His action and statement on each of these occasions were with full knowledge of the fact that the books of the bank showed him to be a stockholder. These undisputed facts, in our opinion, preclude him from afterwards asserting want of authority in Kenyon and Terrell to have the stock issued in his name.

[3] We overrule appellant's first contention above, to the effect that the representations relied upon were made by the officers of the bank individually and not officially. Kenyon and Terrell were president and vice president, respectively, of the bank, and the representations were made at a time when it was about to issue a 100 per cent. stock dividend. There was evidence that the directors were interested in having appellee become a stockholder and director, for the purpose of securing for the institution the value of his connection with it. If the statements then made were not true, the bank was not solvent, and the stock dividend was itself fraudulent. Viewing the evidence most strongly for appellee, we think clearly it will support a finding that Kenyon and Terrell acted in their official capacity, as well as individually, in making the representations.

[4] The statements alleged and testified to as constituting fraud were not as a matter of law mere expressions of opinion. Whether they were made and accepted as representations of fact was an issue for the jury, and was so submitted by the trial court. We therefore overrule appellant's second contention.

[5] We sustain appellant's third contention above. The law is now well settled in this state that a subscriber to the capital stock of a corporation cannot, as against subsequent creditors, defeat his liability as a stockholder for illegality or fraud in his contract of subscription, although such illegality or fraud would be a good defense to an action by the corporation. Thompson v. Bank, 109 Tex. 419, 211 S. W. 977; Mathis v. Pridham, 1 Tex. Civ. App. 58, 20 S. W. 1015; Brooks v. Austin (Tex. Civ. App.) 206

S. W. 723 (writ of error denied); McWhirter v. Bank (Tex. Civ. App.) 182 S. W. 682; Davis v. Burns (Tex. Civ. App.) 173 S. W. 476 (writ of error denied). This rule is in accord with the great weight of authority in this country, although there is some authority to the contrary. Scott v. Deweese, 181 U. S. 202, 21 S. Ct. 585, 45 L. Ed. 822; Lantry v. Wallace, 182 U. S. 536, 21 S. Ct. 878, 45 L. Ed. 1218; Bank v. Newbegin, 74 F. 135, 20 C. C. A. 339, 33 L. R. A. 727; Gress v. Knight, 135 Ga. 60, 68 S. E. 834, 31 L. R. A. (N. S.) 900; and note; Trust Co. v. Blish, 170 Ind. 686, 84 N. E. 814, 85 N. E. 344, 18 L. R. A. (N. S.) 347, and note; 1 Cook, Corp. (6th Ed.) § 210; 7 C. J. p. 516, and note 15. The rule is thus stated in the text last cited:

"A stockholder cannot defend against his liability as such on the ground of fraud in procuring his subscription, unless the circumstances are such that his equity to rescind is superior to the rights of the creditors of the bank."

[6, 7] The burden of proof was on appellee to show, not only every fact essential to establish fraud, but also that the rights of the creditors of the bank had accrued prior to the time he became a stockholder. This was an essential element of the defense which he set up against the suit of the banking commissioner, who represented the creditors, and it was incumbent upon him both to allege and prove it. Bank v. Empey, 35 S. D. 107, 150 N. W. 936; Wallace v. Bacon (C. C.) 86 F. 553; 7 C. J. 516, n. 15; Michie on Banks and Banking, § 1883; 1 Bolles' Modern Law of Banking, 137. From the last text we quote:

"The burden of proof is on the party relying upon a rescission to affirmatively show the equities in his favor, and, among such equities, the fact that there are no creditors who became such while he was a registered stockholder."

[8] Whether appellee was estopped by his laches to rescind his contract of purchase on the ground of fraud was, we think, under the testimony, a question of fact. We therefore overrule appellant's fourth contention.

[9] By his first bill of exceptions appellant complains of the admission over his objection of testimony of appellee:

"That at the time the stock in question was sold to the defendant it was represented to him by Mr. Terrell, one of the owners of the stock in question, that the bank was in good condition and a money-making concern; that the loans of the bank were practically all good and collectable, and that the bank stock was worth about 308 or 309 at that time; that the bank had no big loans out that could not be collected; that the bank was in good shape, and practically all of the loans that were out were good loans."

The objection to this testimony was that the representations were made by Terrell in

his individual capacity and were not binding upon the bank. For the reasons already stated, we overrule appellant's contention based upon this bill of exceptions.

[10] As shown by his second bill of exceptions, that portion of the above testimony concerning statements made to appellee by Terrell, to the effect that the loans of the bank were good and collectable, and its stock was worth about 308 or 309 at that time, was objected to on the ground that such statements were not of fact but were expressions of opinion. The trial court instructed the jury that the representations relied upon as constituting fraud must be statements of fact, and not mere expressions of opinion. We think, clearly, the evidence objected to was of such a character as, if so made, would constitute representations of fact, and we therefore sustain the trial court's ruling on this question.

[11, 12] Appellant's third and fourth bills of exceptions complain of the admission in evidence of testimony that subsequent to appellee's purchase the bank had lost certain sums on certain loans, and of testimony concerning the bank's condition in April, 1921. The objections to this evidence were, first, that the condition of the bank at the time the representations relied upon by appellee were made could not be shown by the state of its assets at a later date; and, second, because the books of the bank were the best evidence of its financial condition at the time involved. Both of these objections, we think, were good under the circumstances of this case. The falsity of the representations relied upon must necessarily be determined by the facts as they existed at the time the representations were made. It was incumbent upon appellee to show the condition of the bank's affairs at that time, its then assets and liabilities, and the then value of such assets. The evidence in the case shows that the bills receivable of the bank had been largely increased since the representations were made, and that the local financial situation had substantially changed. The fact that the bank afterwards loaned money to irresponsible parties, or to parties who later became insolvent, was wholly foreign to any issue in the case. That bills receivable then held were later uncollectable would not be competent, without showing that they were uncollectable at the time the statements were made.

The books, we think, were the best evidence of the assets and liabilities of the bank; but they were not conclusive, and were subject to contradiction by any one who had personal knowledge of the facts. The books, however, would not show the collectability of the assets, but would only show what assets were taken into account in making up the value of the bank's capital stock. The evidence did not show what the assets and liabilities of the bank were at the time the representations were made, and the testimony objected to had reference to the condition of the bank's affairs and its bills receivable some eight or ten months after the representations were made. Portions of some of these bills receivable were held by the bank when the representations were made, but the evidence did not show what effect those particular items had upon the truth or falsity of the representations, and it was not shown that at the time the representations were made all of these items were uncollectable, although they proved to be so in its subsequent liquidation.

[13] It is not necessary for us to pass specifically upon each item objected to in the testimony. The evidence upon another trial should be confined to the condition of the bank at the time the representations were made, and the truth or falsity of the statements regarding the collectability of the bills receivable at that time. Where it is shown that the bank held certain items that were then uncollectable or of doubtful collectability, it is, of course, competent to show that such items were thereafter lost to the bank.

For the errors pointed out, the judgment of the trial court is reversed, and the cause remanded for a new trial.

Reversed and remanded.