BOWLES, Price Adm'r, v. INLAND EMPIRE DAIRY ASS'N.

No. 381.

District Court, E. D. Washington, N. D.

Dec. 27, 1943.

Edward M. Connelly, U. S. Atty., and R. G. Sharpe, both of Spokane, Wash., for plaintiff.

W. C. Losey, of Spokane, Wash., and Cameron Sherwood, of Walla Walla, Wash., for defendant.

Philip D. Macbride, of Seattle, Wash., and Joseph C. Cheney, of Yakima, Wash., amici curiae.

SCHWELLENBACH, District Judge.

Plaintiff seeks to enjoin defendant (an "Association for Marketing Agricultural Products," Rem.Rev.Stats. of Washington, Sections 2878–2909 inclusive) from paying patronage dividends to its member and non-member patrons and to compel defendant to charge back against its patrons certain dividends declared on April 30, 1943. This Court's jurisdiction for this purpose is invoked under Sec. 205(a) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 925(a). Plaintiff contends that the payment of such patronage dividends violates Maximum Price Regulation No. 329, controlling purchases of milk from producers for re-sale as fluid milk. O. P. A. Service, p. 35.851, et seq., Sec. 1351.402 of which provides: "(a) The maximum price for each gallon of milk shall be the highest price each purchaser of milk from a producer paid that producer for milk of the same grade received during January, 1943. * * *" Section 1351.404 defines a purchaser as " '(d) Purchaser means any person who buys milk from a producer for resale. It refers to any branch, division, subsidiary, affiliate, or portion of a business organization, whether corporate or otherwise, purchasing milk from producers in a particular market as distinguished from purchases or other operations in different localities.' " The evidence discloses that defendant is a cooperative dairy association organized in 1932. Like all cooperatives, it makes

advances to its patrons shortly after it receives their products. During the early years of its operation, it paid annual or semi-annual dividends and then, in 1936, it adopted the revolving-fund plan of financing under which it attempted to make the highest possible advances to its patrons while still holding substantial reserves which it used as its capital. Plaintiff's accountant testified that defendant maintained an elaborate card system through which the interest of each patron in defendant's revolving-fund assets was evidenced. This applied to members and non-members alike. Defendant's accounting system is highly departmentalized as between fluid milk, sour cream and other products received by defendant from its patrons. Defendant treats patrons, whether they be members or non-members, in precisely the same way. Its marketing agreement, which was approved by the Director of Agriculture for the State of Washington, is included in its by-laws. The pertinent provisions of the contract and by-laws appear in the footnote.[1] The testimony is that, while the non-members do not sign any contract, they are all familiar with the contract and that they and the Association recognize them as being subject to the terms of the contract and entitled to its benefits. During the period from May 1, 1942, to August 15, 1943, the fluid milk received from non-members constituted 9.4% of the total; and during the period from August 16, 1943, to October 31, 1943, the fluid milk received from non-members constituted 13.4% of the total. During the year ending October 31, 1943, the sour cream and fluid milk combined received from non-members constituted 43.1% of the total. Defendant admitted that the volume of business during the year ending October 31, 1943, exceeded that during the year ending October 31, 1942. It is stipulated that the ceiling price for the sale of fluid milk at retail in this period is 13 cents per quart. No question is raised by plaintiff concerning the compliance by defendant with this price regulation and the sole question involved in this case is whether

---

[1] It provides in its first paragraph that: "That dairyman hereby * * * agrees to sell and deliver to the Association or to any place designated by the Association all of the milk or cream produced by or for him in the state of Washington, Idaho, or any place tributary to Spokane, and the Association agrees to buy and receive such milk or cream and to remit to the member for the same on the basis of market prices as conclusively established by the Association from time to time. * * * The Association shall have the right to determine and designate which dairymen shall sell milk, which dairymen shall sell churned cream and which dairymen shall sell sweet cream. * * * The dairyman expressly agrees that the Association may handle in its discretion some of the milk in one way and some in another and may manufacture into by-products such amount of milk and milk products as the Association may deem proper. * * * The Association may sell the said milk or the by-products therefrom within or without this state at such time and upon such conditions and terms as they deem fair and advisable; * * * If a surplus fund shall accumulate in the operation of the business of the Association, this surplus shall be used in the general business of the Association for the retirement of indebtedness, for replacement of old by new and more modern equipment, and for the expansion of the business of the Association. If at any time, in the opinion of the trustees of the Association, the surplus shall be larger than is needed for conservative operation of the business, the trustees in their exclusive discretion may direct a bonus to be returned to the members or shippers of cream and milk on the basis of butterfat delivered to the Association or to its order during any specified period of time."

In addition to that the by-laws provide:

"The Association shall at all times keep a permanent record of the amount of business done with each and every party using the marketing and manufacturing facilities of the Association, whether he be member or non-member, and these permanent records shall show as nearly as practicable any balance due each and every such person, calculated on a butterfat basis, after all direct cost, plus a proportionate part of all general expenses has been charged against the total units received by the Association.

"All such amounts thus set aside shall be retained as proper reserves of the Association and shall only be repaid to members and non-members, alike, at the option of the Association.

"In case of dissolution of the Association, all sums of money shown on its books as having been retained as reserves from members and non-members shall be paid alike to its members and non-members according to their respective apportionments shown on the books of the Association."

the money paid by the defendant to its patrons may properly be termed the "price paid."

The Emergency Price Control Act of 1942, Sec. 302, 50 U.S.C.A.Appendix, § 942, provides:

"As used in this Act—

"(a) The term 'sale' includes sales, dispositions, exchanges, leases, and other transfers, and contracts and offers to do any of the foregoing. The terms 'sell', 'selling', 'seller', 'buy', and 'buyer', shall be construed accordingly.

"(b) The term 'price' means the consideration demanded or received in connection with the sale of a commodity * * *."

Unquestionably, stripped to its essentials, the question for determination is whether defendant's patrons sold milk to defendant.

Unfortunately, in this case we have little assistance from the Administrator by way of interpretative regulations or opinions. It is true that on May 6, 1942, he issued an interpretation (OPA Service p. 11:804) "Cooperatives. A non-profit cooperative is a person." However, on May 24, 1943, he issued the following interpretative opinion (R. P. I. #22, pages 414–416; OPA Service, p. 2:810 et seq.):

"Cooperatives—Payment of Bonuses or Dividends in Addition to Purchase Price

"Sellers' cooperatives

"(1) Payment of bonuses by a cooperative to members and non-members. A cooperative corporation is formed and owned by certain retail sellers for the purpose of having it buy and re-sell the waste products from their individual businesses. The corporation however buys not only from its members but from non-members as well, and pays to both types of its suppliers, in addition to a purchase price, a bonus at the end of the year based both on the amount of materials purchased from each seller and the amount of profit of the corporation. It also pays dividends to those of the sellers who are its stockholders.

"(a) If the corporation distributes a part of its profits at the end of the year to its members only, this distribution, whether made in the form of dividends on their stock or in other fashion, constitutes a distribution of profits which does not involve the question of exceeding a price ceiling. Such payment is separate and distinct from the purchase price.

"(b) However, if it distributes a bonus at the end of the year to all persons from whom it purchased materials, including its stockholders, that payment is no longer a dividend or distribution of profits to the owners of the enterprise. It is an addition to the price which is paid to all of the persons who sold material to the corporation during the year. If the applicable ceiling price that the corporation may pay is fixed in terms of dollars and cents it is clear that the price paid for the materials during the year, plus the amount of the bonus, may total more than the dollars and cents ceilings. That is, the total price and the bonus may not exceed the maximum price thus established."

Concerning this opinion, in his brief filed in this case, the Administrator said: "We agree with the foregoing opinion in all particulars save that portion wherein the Administrator rules that payments of bonuses by a cooperative to its members alone is not part of the purchase price. This portion of the opinion we believe to be out of harmony both with the decision of the California Court of Appeals in United Milk Producers v. Cecil, 47 Cal. App.2d 758, 118 P.2d 830, and the decision of the Circuit Court of Appeals for the 8th Circuit, in Midland Cooperative Wholesale v. Ickes, 125 F.2d 618, both of which we have previous reviewed. A patronage dividend, we submit, paid to a so-called member of an organization whose membership fee bears no relation to the amount of his commodities handled by the association, must be deemed part of the 'price' of such commodities for the purpose of determining whether or not the ceiling price fixed by the Maximum Price Regulations have been exceeded."

■ Administrative interpretations and practices are to be accorded great weight by the courts in ascertaining the meaning of statutes. United States v. American Trucking Associations, 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345; White v. Winchester Country Club, 315 U.S. 32, 41, 62 S.Ct. 425, 86 L.Ed. 619. Such interpretations lose their persuasiveness when they are ambiguous or inconsistent. Burnet v. Chicago Portrait Co., 285 U.S. 1, 16, 52 S.Ct. 275, 76 L.Ed. 587. The acceptance of administrative practice and interpretation stems from the recognition by the courts of the superior knowledge of administrative officers of administrative needs and convenience. Estate of Sanford

v. Commissioner, 308 U.S. 39, 52, 53, 60 S.Ct. 51, 84 L.Ed. 20. In the Sanford case, the Court declined to accept one administrative construction of the statute because the Government declined to take any position concerning its own conflicting interpretations and one of them was in conflict with the Court's previous rulings. Here subdivision (a) patently conflicts with subdivision (b) of R.P.I. No. 22, pp. 414–416; it even conflicts with plaintiff's present attempted version of his May 6, 1942, interpretation of the G. M. P. R. use of the word "person." Surely a court would not be justified in placing much reliance on an administrative interpretation so inconsistent with itself and so ambiguous that the Administrator feels constrained to repudiate part of it. This confusion on the part of the Administrator negatives any such superior knowledge by him as would persuade the Court to lean on him for interpretative assistance.

■ Defendant's position is that the payments made by it to its patrons are not a part of the price paid for its patrons' products. Defendant asserts that it is the mere agent of its patrons through which they cooperatively make sales of their products to the ultimate consumers. Defendant insists that the only ceiling price applicable to it is the 13¢ per quart with which requirement it religiously complies. It asserts that, despite the fact that its contract uses the words "sell" and "buy", the contract must be construed in conjunction with the whole transaction by which a mere agency relationship is created. The majority of the decisions of the courts sustain defendant in that position. The most concise statement of the reasons for the rule that I have found is contained in the following from Texas Certified Cottonseed Breeders' Ass'n v. Aldridge, 122 Tex. 464, 61 S.W.2d 79, 82, 83: "The construction of this contract may be based upon one cardinal rule, viz., What was the intention of the parties thereto when construed in connection with the history of the class of legislation and the purposes sought to be attained? What is the nature of the title by which an association holds property which it is marketing for its members? To what extent does it act in its own corporate right and to what extent in a fiduciary capacity? The intention of the parties to a contract will control. If necessary, to give effect to the intention of the parties courts will brush aside mere form and examine the instrument as a whole, in the light of the nature and circumstances of the transaction, with a view of ascertaining the true intention of the parties expressed in the instrument. * * * By the terms of the contract the grower has surrendered control over the sale of his product, and thereby to this extent has divested himself of an important element of ownership. The contract upon this point is clothed in the terminology of a sale. The relation of consignor and factor has been abandoned. The logical and practical object of the members, as expressed in the contract, is to clothe the transaction in the language of a sale for the purpose of permitting the exercise of all powers named in the contract rather than a consignment in order to enable the association to enter bona fide transactions free from the embarrassment arising out of an incomplete title. * * * The members of the association, in order to promote their welfare, delivered their seed to the association. They constituted the association their agent with broad and exclusive powers to handle and sell their commodity. This was necessary to accomplish the very purposes for which it was created." The Circuit Court of Appeals for the 9th Circuit, in passing upon this question, raised in reference as to whether the money received by a cooperative association constituted income, stated "petitioner never pretended to be the owner of these sums, but, as required by its by-laws, 'prorated' and credited them to its members. The fact that the sums were not payable to the members on demand, or at any fixed time, does not alter the fact that they were their property and not petitioner's. Petitioner held them, not as owner, but as agent or trustee for the members." San Joaquin Valley Poultry Producers' Ass'n v. Commissioner of Internal Revenue, 136 F.2d 382, 385. The Supreme Court of Washington held similarly in Yakima Fruit Growers Association v. Henneford, 182 Wash. 437, 47 P.2d 831, 832, 100 A.L.R. 435, in passing upon the liability for the State Occupational Tax under which persons growing or cultivating for sale any agricultural product was exempt. In that case, the court said: "The respondents cite a number of cases holding the relationship between members of cooperative associations and the corporations to be that of agency, and this appears to be the generally accepted rule with reference to such organizations. * * * If one individual

grower produced, packed, warehoused, and sold his crop, it would hardly be contended that he did not come within the exception of the statute. If two or more should pool their crops, and co-operate in the packing, warehousing, and selling, the situation would not be different from that of the individual grower." A reference to the briefs filed in that case shows that the cases to which the court referred as having been cited were the following: Kansas Wheat Growers v. Board, 119 Kan. 877, 241 P. 466; Phez Co. v. Salem Fruit Union, 201 Or. 514, 201 P. 222, 25 A.L.R. 1090; Mountain States Beet Growers Ass'n v. Monroe, 84 Colo. 300, 269 P. 886; Tobacco Growers Cooperative Ass'n v. Harvey & Son Co., 189 N.C. 494, 127 S.E. 545, 547, 47 A.L.R. 928; Oregon Growers' Coop. v. Lentz, 107 Or. 561, 212 P. 811; Owen County Tobacco Society v. ·Brumbach, 128 Ky. 137, 107 S.W. 710, 32 Ky. Law Rep. 916; Poultry Producers v. Barlow, 189 Cal. 278, 208 P. 93; California Raisin Growers v. Abbott, 160 Cal. 601, 117 P. 767; Texas Certified Cottonseed Breeders' Ass'n v. Aldrich, 122 Tex. 464, 61 S.W.2d 79. See, also, Inland Empire Rural Electrification, Inc., v. Department of Public Service, 199 Wash. 527, 539, 92 P.2d 258; Owensboro v. Dark Tobacco Growers', 300 S.W. 350; Dark Tobacco Growers' Cooperative v. Robertson, 84 Ind. App. 51, 150 N.E. 106, 112; Georgia Milk Producers v. Atlanta, 185 Ga. 192, 194 S. E. 181; Department of Treasury v. Ice Service, 220 Ind. 64, 41 N.E.2d 201; Industrial Commission v. United Fruit Growers', 106 Colo. 223, 103 P.2d 15; Bogardus v. Santa Ana Walnut Growers', 41 Cal. App.2d 939, 108 P.2d 52; Rhodes v. Little Falls Dairy Co., 230 App.Div. 571, 245 N. Y.S. 432, affirmed 256 N.Y. 559, 177 N.E. 140; Johnson v. Staple Cotton Co-op., 142 Miss. 312, 107 So. 2.

The attitude of the Farm Credit Administration on this question was explained in F. C. A. Miscellaneous Report No. 63, entitled "Application of Federal Income Tax Statutes to Farm Cooperatives," p. 50, as follows: "In final effect, all true cooperative organizations are regarded by some authorities as agencies. Thus, the so-called purchase and sale marketing cooperative which takes title to the product is deemed to have the nature of an agency since the purchase price paid to patrons theoretically represents merely an advance which is augmented at the close of the year by the allocation or refund of net savings."

In answer to this proposition, plaintiff cites a number of cases which follow the minority rule. He also cites United Milk Producers v. Cecil, 147 Cal.App.2d 758, 118 P.2d 830. In this case, the California court held that the California Milk Control Act applied to producers of milk who sold through cooperatives. Analysis of ·that decision discloses that it, in no sense, reaches the point involved here. It is true that it involved "milk" and "price." It, however, was a minimum price statute which prohibited the sale of milk by ány producer for less than the minimum. Since no producer could sell for less than the minimum, it made no difference whether the producer sold directly or through a cooperative. The sale of a product through an agent to a consumer is no less a sale than one by the producer directly to the consumer. This California case would be in point here if defendant's patrons were contending that, since they sold through a cooperative, they were entitled to exceed the 13¢ per quart maximum price to consumers.

What I have said concerning the California case applies equally to the case of Midland Cooperative Wholesale v. Ickes, 8 Cir., 125 F.2d 618, on which plaintiff also relies. There, there were cooperative purchases and the court held that a minimum price statute could not be exceeded by purchasing through a cooperative. Actually, that case held that, since the Guffey Coal Act, 15 U.S.C.A. § 828 et seq., permitted purchase by farmers' cooperatives for less than the minimum, the portions of the petitioner's sales which were through bona fide farmers' cooperatives could sell for less than the minimum. In fact, the order of the Director of the Bituminous Coal Division, to review which the action was started, so provided. Midland Cooperative Wholesale v. Ickes, 8 Cir., 125 F.2d 618, 621. "The order to be reviewed recognizes petitioner's right to receive the discounts upon qualifying as intervening agency for all sales of coal in not less than cargo or railroad car-lots to retail associations which are 'bona fide legitimate farmers' cooperative organization[s]', but the right is denied in respect to any bituminous coal which petitioner purchases for re-sale to any organizations which do not come within the description of farmers' cooperatives."

■ Plaintiff contends that defendant forfeited its right to assert that these patronage dividends are not a part of the price because, in declaring its April dividends, it limited them to the patrons furnishing fluid milk and did not permit the furnishers of sour cream to participate. Clearly, if defendant diverted returns earned by the sale of sour cream to the patrons furnishing fluid milk, such device would be construed as an increase in the price received by fluid milk patrons for their products and, as a result thereof, such receipts would exceed 13¢ per quart for milk ultimately delivered to the consumer and would violate the price ceiling regulation. The testimony does not bear out this contention. Defendant's testimony is undisputed that all of the money paid to fluid milk patrons resulted exclusively from fluid milk sales. The books of the defendant are highly departmentalized and had this diversion and evasion occurred, plaintiff had ample opportunity to prove it. Plaintiff bases this contention exclusively on the fact that when, in the past, patronage dividends were paid, the same amount was received by the furnishers of sour cream as was received by the furnishers of fluid milk. That proves exactly nothing. The patronage dividends to be paid to producers in a farmers' cooperative need not be and should not be the same to every patron. Since October 24, 1844, when the Rochdale Society of Equitable Pioneers registered under the Friendly Societies Act, the so-called Rochdale principles have been recognized. "Digest of Cooperative Laws at Home and Abroad," Margaret Digby, Horace Plunkett Foundation; "Abstracts of the Laws Pertaining to Cooperatives in the United States of America, its Possessions and Territories," p. 56, Ostrolenk and Tereshtenko; "The English Cooperatives," p. 24, Elliott; "Cooperative Enterprise in Europe," a Report of the Inquiry on Cooperative Enterprise to the President, February 19, 1937, p. 20. While these principles have been variously stated by different authorities, they all agreed upon the inclusion therein of the principle that distribution of the surplus originating in the economic activity of an organization is in direct proportion to the participation of members. As Mr. Justice Brandeis said in Frost v. Corporation Commission, 278 U.S. 515, 546, 49 S.Ct. 235, 246, 73 L.Ed. 483: "No one plan of organization is to be labeled as truly co-operative to the exclusion of others." No student of cooperatives will deny. that if one principle of cooperatives has been given more universal recognition than any other, it is the one under which patronage dividends are paid upon a patronage basis. Plaintiff's contention in this regard is in direct contradiction to this principle. To accept plaintiff's contention that defendant should give to the patrons furnishing sour cream a part of the returns resulting from the sale of fluid milk would do violence to almost a century of cooperative practice.

■ Plaintiff contends that defendant has no right to pay dividends out of its present earnings to those who, in past years, have furnished reserves by which defendant was capitalized. In this, he challenges the revolving-fund plan of cooperative financing. "The problem of how equitably to capitalize a cooperative so that the capital furnished by a particular member will bear a direct relation to his patronage and ultimately will be returned to him is believed by many competent cooperative leaders to be solved best through the use of the revolving-fund plan of financing." "Legal Phases of Cooperative Associations," Hulbert, F. C. A. Bulletin No. 50, May, 1942, p. 276. See, also, Sanders, " 'Retains' that Nobody Feels," 3 News for Farmer Cooperatives 5–6, Farm Credit Administration, 1936; Sanders, "Organizing a Farmers' Cooperative," Farm Credit Administration Cir. C-108, 42 pp., 1939. Plaintiff complains that defendant waited so long to retire these revolving-fund obligations. The reason for this is explained by Hulbert ("Legal Phases of Cooperative Associations, p. 276) as follows: "The derivation of the name 'revolving-fund plan' becomes more apparent when an association reaches the stage when the oldest investments of the patrons of previous years may be retired. It is only when an association reaches this stage that its revolving fund begins to revolve. * * * Accumulations or retains for capital purposes, under this plan of financing, should be at least recorded on the books of the association as credits in favor of the proper. persons. (This is what the defendant here did.) * * * The revolving-fund plan of financing is believed to be the most practicable way of insuring that ultimately all the major contributions of patrons to the assets of an association may be returned to them. The fairness of the plan should make it easier for an association to

obtain members and to build up an adequate capital. It provides a means by which the capital of an association increases as its volume of business increases. Many of the most successful agricultural cooperatives use this method of financing. It is being adopted not only by new associations but by associations which have been operating for many years." The validity of the revolving-fund plan of financing has been specifically recognized by the courts. Reinert v. California Almond Growers Exchange, 9 Cal.2d 181, 70 P.2d 190; Adams v. Sanford Growers' Credit Corporation, 135 Fla. 513, 186 So. 239; Ozona Citrus Growers' Association v. McLean, 122 Fla. 188, 165 So. 625; Proodian v. Plymouth Citrus Growers Association, 143 Fla. 788, 197 So. 540; Parker v. Dairymen's League Co-operative Association, Inc., 222 App. Div. 341, 226 N.Y.S. 226; Loomis Fruit Growers' Association v. California Fruit Exchange, 128 Cal.App. 265, 16 P.2d 1040.

Plaintiff urges that, because defendant's business with non-members during the last fiscal year exceeded 15 per cent of its total gross business for the preceding fiscal year, it cannot claim to be a cooperative. This for the reason that the statute (Rem. Rev.Stat. of Wash. Sec. 2882) makes such a limitation on the powers of associations for marketing agricultural products. On this point, it should be noticed that, while during the last fiscal year only 13 per cent of defendant's fluid milk business was done with non-members, 43 per cent of all of its business was done with non-members. When plaintiff so urges, he contravenes a well established and long recognized governmental policy.

A similar question was raised in the case of Board of Trade v. Wallace, 7 Cir., 67 F.2d 402, 407. There it was contended that a farmers national grain corporation had disqualified itself from being entitled to the benefits of the Grain Futures Act, 7 U.S.C.A. § 8, by dealing in the products of non-members in an amount greater in value than handled by it for members. There the court held that, since the Grain Futures Act required that "the governing board thereof does not exclude from membership in and all privileges on such board of trade any duly authorized representative of any lawfully formed and conducted cooperative association of producers," that the standard by which one Federal agency was to judge whether or not an organization was a "lawfully formed and conducted

cooperative association of producers" was whether the cooperative complied with paragraph Third, section one of the Capper-Volstead Act (7 U.S.C.A. § 291, Par. 3) which provided: "That the association shall not deal in the products of non-members to an amount greater in value than such as are handled by it for members." If that is the standard, certainly the Administrator here has no valid complaint against this defendant.

■■ A similar standard was adopted by the Congress in the Revenue Act of 1926, 44 Stat. Sec. 231, pp. 39 and 40, 26 U.S.C.A. Int.Rev.Acts, page 183, and has been carried in various revenue statutes since that time. It was contained in the Agricultural Marketing Act of 1929, 12 U.S.C.A. § 1141 et seq., the Farm Credit Act of 1933, 12 U.S.C.A. §§ 1134, 1134f and 12 U.S.C.A. § 1141j. The Motor Carrier Act of 1935, 49 U.S.C.A. § 301 et seq., contained a similar provision. The Agricultural Adjustment Act of 1933, as amended, 7 U.S.C.A. §§ 601–659, inc., directed the Secretary of Agriculture to "accord such recognition and encouragement to producer-owned and producer-controlled cooperative associations as will be in harmony with the policy toward cooperative associations set forth in existing Acts of Congress." 7 U.S.C.A. § 610(b) (1). The Soil Conservation and Domestic Allotment Act of 1936, as amended in 1938, 16 U.S.C.A. § 590h(b), contained a similar provision concerning the recognition by the Secretary of the "policy towards cooperative associations set forth in existing Acts of Congress." Thus it will be seen that so far as the Congress is concerned, the 50 per cent provision has been interwoven into our law through many and varied and repeated enactments. If the Administrator of O. P. A. is to heed Congressional intent in determining when an association is or is not a cooperative on the basis of its non-member participation, he must accept the 50 per cent rule as originally enunciated in the Capper-Volstead Act. The Emergency Price Control Act recognized the same policy. Section 3(d), 50 U.S.C.A. Appendix, § 903(d), provides: "* * * Nothing contained in this Act shall be construed to modify, repeal, supersede, or affect the provisions of the Agricultural Marketing Agreement Act of 1937, as amended, * * *." The Agricultural Marketing Act of 1937 provides, 7 U.S. C.A. § 608(c) (5) (F): "Nothing con-

tained in this subsection (5) is intended or shall be construed to prevent a cooperative marketing association qualified under the provisions in sections 451 to 457 of this Title (Capper-Volstead Act) engaged in making collective sales or marketing of milk or its products for the producers thereof, from blending the net proceeds of all of its sales in all markets in all use classifications, and making distribution thereof to its producers in accordance with the contract between the association and its producers;" The same Act further provides (7 U.S.C.A. § 610(b) (1): "The Secretary, in the administration of this chapter, shall accord such recognition and encouragement to producer-owned and producer-controlled cooperative associations as will be in harmony with the policy toward cooperative associations set forth in existing Acts of Congress, and as will tend to promote efficient methods of marketing and distribution." Thus it will be seen that the Congress, in enacting the Price Control Act of 1942, continued in its long established and well recognized policy of using the Capper-Volstead Act as the yard stick to determine the relationship between the Government of the United States and agricultural cooperatives. This, moreover, is an issue which only may be raised by the State of Washington. While such activities may have been ultra vires of the corporation, only the sovereign from which the corporation derived its power can object. National Bank v. Matthews, 98 U.S. 621, 628, 25 L.Ed. 188; National Bank v. Whitney, 103 U.S. 99, 26 L.Ed. 443; Swope v. Leffingwell, 105 U.S. 3, 26 L.Ed. 939; Reynolds v. Crawfordsville First National Bank, 112 U.S. 405, 413, 5 S.Ct. 213, 28 L.Ed. 733; Lantry v. Wallace, 182 U.S. 536, 21 S.Ct. 878, 45 L. Ed. 1218. See, also, Guaranty Trust Company v. United States, 9 Cir., 139 F.2d 69, decided November 29, 1943; Washington Co-operative Egg & Poultry Association v. Frederick A. Taylor, 122 Wash. 466, 477, 210 P. 806; Boyle v. Pasco Growers Association, 170 Wash. 516, 17 P.2d 6.

 Plaintiff argues strenuously that to permit this defendant and cooperatives generally to pay patronage dividends would "torpedo" the price control program and open the flood gates of inflation. The Court must approach such a consideration cautiously for fear that its conclusions on questions of law may be colored by its opinion on questions of policy. It is per-

missible, however, to make "an examination of the general Congressional processes intended to be served by the Act" if such examination will "aid in the resolution of (the) dispute" involved in the litigation. Colgate-Palmolive-Peet Company v. United States, 64 S.Ct. 227, decided December 13, 1943. While the purposes delineated in the Price Control Act of 1942 are multitudinous, the general Congressional objective is simple and well known. It was to prevent the evaporation of property values through price rises which would increase the burdens of the cost of war to the tax payers and prevent the orderly readjustment to a peace time economy at the conclusion of the war. Broadly speaking, the technique being used is to prevent the bidding up of prices on commodities that are scarce through the medium of rationing, and on all commodities that are essential through the medium of price ceilings. In the field of price ceiling operation, plaintiff has seen fit to place controls at various points in the distribution of the several commodities. As to some commodities, controls are placed at one point in the process of distribution; as to other commodities, they are placed at another point or points. Different circumstances actuate the Administrator in determining the points at which such controls are placed. For example, in explaining his reason for fixing the point of control in the case of beef first at the domestic meat packing industry, the Administrator stated it was because there was no direct relationship between number of beef animals produced and the prices of those animals. In re Kaufman Beef Co., et al., O. F. A. Service 600:276,277. The fixing of multiple controls is intended only for the purpose of facilitating the Administrator in effective control. In the final analysis, the control at the point of the price to the ultimate consumer is the only one which can directly serve to prevent inflation. The amount of money which goes into circulation as a result of the production and distribution of a product depends exclusively upon that final price. In the case of milk in the Spokane milk shed, that final ceiling price is 13¢ a quart. Milk in this area and in all areas is distributed in three ways: (1) By the individual producer directly to the consumer, (2) by the sale by a group of producers acting cooperatively to the consumer, (3) by the sale by the producer to an independent distributor who, on his own behalf, sells to the consumer. Regardless of which road

is taken, there is put into circulation only the sum of 13¢ for each quart of milk. The Administrator does not concern himself with any profits or accumulations that may result from the first or third methods of distribution. The power to control initial and intermediate prices is given to him in order that he may control more effectively the price at the point of consumption. However, when he urges that unless he can discriminate against those producers who co-operatively market their products by forcing them, as he suggests, to use their accumulations for the purchase of war bonds or the payment of a double income tax that the whole price control program over agricultural products will be torpedoed, his reasoning is artificial and his conclusion is illogical. The plaintiff argues that, unless this step is taken, all the privately owned distributors will convert themselves into co-operatives resulting in a general breakdown of intermediate controls on agricultural products. No such contention is justified. Of course, the Administrator has the right to prevent the use of any device purposefully contrived in order to evade the provisions of the Price Control Act of 1942. That power, however, is not such as to authorize him to disrupt and destroy the entire system of farm cooperatives established over a period of half a century and Congressionally recognized and encouraged for a period of forty-five years. Unquestionably, the Congress was aware of this when it inserted Section 3(d) in the Price Control Act of 1942.

There has been universal recognition of the important segment in our economic life occupied by Farm-cooperatives. Testifying before a sub-committee of the Committee on Agriculture and Forestry of the United States Senate concerning a bill "To Establish a Division of Cooperatives in the Department of Agriculture" (S.2138, 76th Cong. 3d Sess.) on April 24, 1940, the Secretary of Agriculture said that one-third of the farmers of the United States make use of cooperative facilities for the marketing of their products and for the buying of farm supplies. For valuable and voluminous data concerning the scope and growth of the cooperative movement, see: R. H. Ellsworth, "Statistics of Farmers' Cooperative Business Organizations, 1920–1935," Farm Credit Administration Bulletin No. 6; "A Statistical Handbook of Farmer Cooperatives," F. C. A. Bulletin No. 26 (1938); and "Statistics of Farmer Marketing and Purchasing Coopera-

tives, 1938-1939"; "Marketing Assessment," F. C. A. Miscellaneous Report No. 21, 1940. In 1927, The "Businessmen's Commission on Agriculture," jointly set up by the National Industrial Conference Board and the Chamber of Commerce of the United States, advocated as the third of its eight-point program on Agriculture "cooperative buying and selling organizations" (The Condition of Agiculture in the United States and the Measures for its Improvement, 1927). In 1932, President Hoover's Research Committee on Social Trends stated: "On the business side the farmer has faced a corporate civilization not with corporation farming but with economic cooperation. Nevertheless he has adapted corporation techniques to his own ends, slowly at first and against opposition, but more rapidly of late and with government approval and assistance." "Recent Social Trends in the United States," Report of the President's Research Committee on Social Trends, p. 506. The Federal Farm Board, created under the Agricultural Marketing Act of 1929, 46 Stat. 11, 12 U.S.C.A. § 1141 et seq., had the mandate "to encourage the organization, improvement and methods of effective cooperative associations." Concerning its activity, this is said: "The Federal Farm Board thus became a special propaganda and service agency to agricultural cooperative associations. It took over the Division of Co-operative Marketing established in the Bureau of Agricultural Economics under the Co-operative Marketing Act of 1926, 7 U.S.C.A. § 451 et seq., greatly enlarged the staff, and undertook to build up national distributive organizations for the several agricultural commodities capable of carrying on centralized collective bargaining, backed up by storage operations in nonperishable commodities." "Government and Economic Life", Brookings Institution, June 30, 1940, Vol. 2, p. 899. Since the passage of the War Revenue Act of 1898, which exempted farmer cooperative associations from the payment of stamp taxes, the Congress has given special statutory recognition to the importance of cooperatives forty-two times. See, "Legal Phases of Cooperative Associations," Hulbert, p. 307 et seq.; "Abstracts of the Laws Pertaining to Cooperatives," Ostrolenk and Tereshtenko, p. 315–340 inc. The Supreme Court, in Tigner v. Texas, 310 U.S. 141, 60 S.Ct. 879, 881, 84 L.Ed. 124, 130 A.L.R. 1321, described this legislative recognition as follows: "Since Connolly's case (Con-

220

nolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679) was decided, nearly forty years ago, an impressive legislative movement bears witness to general acceptance of the view that the differences between agriculture and industry call for differentiation in the formulation of public policy. The states as well as the United States have sanctioned cooperative action by farmers; have restricted their amenability to the anti-trust laws; have relieved their organizations from taxation. * * * At the core of all these enactments lies a conception of price and production policy for agriculture very different from that which underlies the demands made upon industry and commerce by anti-trust laws. These various measures are manifestations of the fact that in our national economy agriculture expresses functions and forces different from the other elements in the total, economic process. Certainly these are differences which may be acted upon by the lawmakers."

This Court is not interested in the question of the advantages or disadvantages of the maintenance of cooperative associations as a part of our economic structure. It is interested in the economic result of its decision only to the extent that understanding that result may assist it in ascertaining Congressional intent. No one can deny the almost devastating effect upon cooperatives if patronage dividends are proscribed. The patronage dividend device has been woven into the warp and woof of the cooperative system. To take from cooperatives the right to pay patronage dividends ultimately would destroy the cooperative structure. The cooperating producer agrees to restrictions on his method and volume of production and to control of his output. He assumes the burden of any losses involved in the processing, distribution and sale of his products. The responsibility for mistakes of management and losses in collections must be borne by him. None of these burdens or responsibilities are borne by the producer who sells to an independent distributor. Once his product is sold at a price, his responsibility ends. He controls his production and sells to whom and for how long he pleases. No one knows how long the war will last nor how long thereafter price controls will be in effect. It requires no fanciful reasoning to conjure up doubts concerning the continued existence of cooperatives deprived of the right to pay patronage dividends. The stark fact is that the consistent extension of the Administrator's position here would make a war casualty of the Farmer Cooperative System. The long-range objective of the Price Control Act was to prevent economic dislocation. Remembering the widespread use of farmer cooperatives and the well-established legislative and administrative policy of our Government in fostering them, I cannot believe the Congress intended thus to strike them down. In the light of this background, the Court would not be justified in so concluding without a more clearly expressed indication of Congressional intent. The Congress gave to the Administrator the power to control the "price" in the event of a "sale." 50 U.S.C.A. § 942(a) and (b). Defendant's patrons do not sell their products to defendant. Defendant acts merely as the patrons' agent in selling patrons' products to the ultimate consumer. The only "price" involved in the transaction occurs in that sale. The Administrator can and does and will control that price. The Congress has given him no power artificially to determine that deliveries to defendant by its patrons constituted sales.

The action must be dismissed.