[No. 447-2.    Division Two.    May 11, 1972.]

*In the Matter of the Voluntary Dissolution of* KITSAP-MASON DAIRYMEN'S ASSOCIATION.

Richard E. Schultheis (of Schultheis, Maddock & Fox), for appellant.

William R. Garland, for respondent.

PETRIE, C.J.—The central issue in this appeal requires resolution of priorities upon the voluntary dissolution of a nonprofit agricultural cooperative marketing association. The determinative question is whether a nonmember holder of a Finance Fund Certificate (FFC), issued by Kitsap-Mason Dairymen's Association, who has never had any direct business relationship with the association and who has paid full value for his certificate, stands in a position of priority to other claimants to the association's remaining assets. The nonmember holder of the FFC contends that he should be ranked (a) on a par with other creditors; or (b)

if not so ranked, behind creditors but ahead of member holders of FFC; or (c) if not so ranked, on a par with other holders of FFC issued prior to April 5, 1969. We hold, under the facts and circumstances, the nonmember FFC holder has no priority over other FFC holders.

The specific certificates were authorized by resolution adopted by Kitsap's board of directors on November 24, 1965. The *introductory* portion of the resolution expressed a need to establish a fund to provide reserve capital to be derived from amounts retained by the association from its members,

> but evidenced by *firm* obligation of the Association to return said retained monies to such members, or the successor of a particular member, at a fixed date in the future, and to provide for payment of interest thereon during the interim.

(Italics ours.) The *operative* part of the resolution (1) created the fund, known as the finance fund; (2) authorized its use for payment of indebtedness and/or bonds or obligations of the association at the discretion of the board; (3) directed that the retains, not to exceed 10 per cent of the resale price of milk and dairy products, shall be placed in the fund but may be commingled and utilized with other funds of the association; (4) authorized the issuance, annually, of certificates representative of each member's proportionate deduction; (5) directed that the full-principal amount of *each certificate shall be due on a date certain* 10 years from date of issue, and that the certificates shall bear interest at a designated rate, payable annually, not to exceed 8 per cent per annum; (6) declared that said certificates shall be assignable or transferable to another member or to a nonmember, provided that to be effective the certificate would have to be properly endorsed by the record holder, surrendered by him, and noted upon the books of the association, at which time a replacement certificate would be issued; (7) authorized the board to regulate or control the "exchange of common stock for Finance Fund Certificates"; and (8) *reserved to the board* "the right to

amend this Resolution from time to time, and further *specifically to amend the terms, form and conditions of the certificate as aforesaid."* (Italics ours.)

The actual certificates subsequently issued[1] declared in part:

[This certificate] is issued and accepted subject to the Association's Articles of Incorporation and By-Laws, pursuant to Resolution No. 11-24-65 of said Association, and amendments thereto, *as may hereafter be made.*

(Italics ours.)

In order to appreciate the issues presented by this appeal, it is necessary, briefly, to analyze the historical devel-

---

[1]The FFC were issued in the following form:

"No. ......................................    ...................................... Series
                                                                "Issue Date
                      "FINANCE FUND CERTIFICATE
                                   "of
             "Kitsap-Mason Dairymen's Association
                          "811 Park Avenue
                       "Bremerton, Washington

"KITSAP-MASON DAIRYMEN'S ASSOCIATION, a cooperative marketing association, organized under the laws of the State of Washington, Revised Code of Washington, Title 2432, will pay at its office in Bremerton, Washington, to the order of the payee below named, the sum of ........................................................................ Dollars, on or before ten years from date, with interest at the rate of .............. per cent, per annum annually, commencing the 31st day of December, 19.............., at its office aforesaid, the payee hereof being........................................................ ........................................................................ whose address is ........................................................ This Finance Fund Certificate, or any interest therein is transferable or assignable for collateral only on the books of the Association upon surrender of the certificate, properly endorsed. It is issued and accepted subject to the Association's Articles of Incorporation and By-Laws, pursuant to Resolution No. 11-24-65 of said Association, and amendments thereto, as may hereafter be made. The said sum aforementioned and interest thereon shall be payable from the general funds of the Association. Right to make prior call and payment is reserved to the Association pursuant to said Resolution.

"ATTEST:
                              "KITSAP-MASON DAIRYMEN'S ASSOCIATION

                              "By ................................................................
"By ......................................            "President
             "Secretary

                              "Due Date ......................................"

opment of Kitsap's capitalization and funding as well as Kitsap's basic method of operation.

Kitsap was originally incorporated June 7, 1924, as a nonstock agricultural cooperative under the provisions of what is now RCW 24.32. Its membership was composed solely of milk producers, each of whom was required to sign an exclusive marketing agreement in which he agreed to sell his entire production to Kitsap. Articles of incorporation were amended in 1930 to provide for both common and preferred stock. Further amendment of the articles in 1933 eliminated the preferred stock, but permitted common stock with a stated capital value of $50,000. Subsequent amendments authorized increased capitalization. In 1962, the last amendment, 750,000 shares of common stock were authorized at a value of $1 per share.

Acquisition of stock initially was by purchase and then between 1931 and 1939 a method of deducting for stock from members' monthly milk checks was established, the exact details of which are not known. Deductions from monthly milk checks for stock continued in various forms until May 31, 1966, and produced capital for Kitsap. On May 31, 1966, the use of retains to acquire stock ceased. Retains thereafter were placed in the finance fund where they accrued for subsequent issuance, annually, of FFC to individual members. There is no evidence that certificates of stock were ever issued and the only indicia of "stock" is a book entry for a dollar amount.

On becoming inactive, a member's stock was redeemed in full, either from cash on hand or borrowed money, until early 1959.[2] On April 15, 1959, a policy of redemption over a 5-year period was established. Policy was changed in December, 1966 to permit either payment on a 10-year basis or exchange from stock to FFC. On December 22, 1965, Kitsap's board passed a resolution permitting members, active or inactive, to "surrender" stock in exchange for FFC,[3]

---

[2]Apparently the "stock" was merely "repurchased" with no consideration as to its "retirement."

[3]Stock acquired for the year 1956 and prior years was exchangeable

but the privilege of conversion was frozen by the board on February 1, 1968. Redemption of stock ceased altogether in 1968.

One other aspect of Kitsap's financial structure should also be mentioned. The amount Kitsap realized after payment of operational expenses, interest, advances to its members, and after net creation of reserves, was sometimes called "surplus" or "bonus" or "profit." (Although not designated as such, it could also have been called "net margin.") Because the cost of processing and marketing the milk and its products could not be determined accurately on a monthly basis, Kitsap's directors, each month, estimated the uniform price to be paid to members for milk shipped by making what they determined would be an adequate allowance for costs. A recapitulation was made annually to determine the actual costs for the previous year. Any amount withheld from the resale price paid to the members, in excess of the costs incurred, was distributed to the members as "patronage." Until 1959 patronage refund was paid in cash. Commencing in 1959, payment was only partly in cash and partly in revolving fund certificates. That method continued until 1964, after which time Kitsap no longer realized any "surplus" and patronage ceased. Revolving fund certificates were payable at the board's discretion and declared on their face that they were subordinate to all other claims. Some revolving fund certificates were still outstanding at the time of dissolution, but because of their subordinate position, they are not at issue in this action.

At the annual membership meeting of February 22, 1969, the members authorized negotiations for the sale of all of Kitsap's assets, and then recessed the meeting to late March, 1969. A proposal for sale of Kitsap's assets to Consolidated Dairy Products for $847,000, subject to adjustments, was presented to the membership at the March

for FFC for the year series 1966; stock acquired subsequent to 1956 was exchangeable for the FFC year series 10 years subsequent to the stock acquisition year.

meeting. At the same meeting, an advisory proposition was submitted to vote by all persons present who had stock and FFC regardless of active membership. This proposition was: on dissolution, to pay the association's creditors and thereafter to treat the owners of stock and FFC *equally,* paying each of them on a pro rata basis from any remaining balance. The proposition was approved by more than three-quarters in favor. The meeting was recessed to April 5, 1969.

On April 1, 1969, Kitsap's board of directors adopted a resolution amending the resolution of November 24, 1965 (which had originally authorized FFC), effective April 5, 1969. The operative portion of the new resolution provided as follows:

RESOLVE that the obligation of the finance fund certificates now outstanding are declared to be subordinate to the rights of and obligations for the payment to other creditors of the association upon obligations arising in favor of said creditors for goods and services sold to or furnished to said Association, for money loaned to said Association, or arising as a result of transactions other than the issuance of evidences of retained percentage for milk production processed and distributed by the Association, *i.e.*, finance fund certificates, revolving fund certificates and stock; and it is further

HEREWITH RESOLVED, that in the event of a dissolution, *the finance fund certificates shall be paid in the same percentage of face value as is the payment made on stock.*

IT IS FURTHER RESOLVED that *the action of* the Board of Directors of February 1, 1968, in *freezing* common stock exchange be and the same *is hereby rescinded, and the provisions of resolution 12/22/65 be reinstated, permitting free exchange of common stock for conversion to finance fund certificates.*

(Italics ours.)

At the final membership meeting on April 5, 1969, the members, by appropriate margin, approved the sale of Kitsap's assets to Consolidated Dairy Products Company, and approved the dissolution proposal contained in the board's

resolution of April 1, 1969. The board of directors, as trustees in dissolution, petitioned the Superior Court for Kitsap County for voluntary dissolution of the corporation under supervision of the court, pursuant to the proposal that after payment of Kitsap's creditors, remaining assets be devoted to payment of FFC and "stock" on an equal basis pro rata to the owners thereof in the proportion that remaining assets bear to the aggregate of FFC and "stock" outstanding. It appears that after payment of creditors, approximately $245,000 will be available to apply upon approximately $785,000 of FFC plus a small amount of stock not yet transferred to FFC. Of the existing FFC, $241,000 resulted from direct issue for retains, $171,000 resulted from stock conversions prior to February 1, 1968, and $385,000 resulted from stock conversions subsequent to April 5, 1969.[4] (Redemptions in the approximate amount of $16,000 account for the difference in totals.)

Objections to the plan of dissolution were filed by several parties, one of whom is Walter A. Hall, the sole appellant herein. After hearing, the trial court approved Kitsap's plan of dissolution and this appeal followed.

Mr. Hall had never been a member of Kitsap; in fact, except for becoming the owner by transfer of FFC, he had never had any contact with Kitsap. He acquired approximately $39,000 of FFC by giving full value therefor as part payment for the sale of some property in Eastern Washington to Stanley Johnson. A document evidencing the sale was executed by Mr. Hall and Mr. Johnson on March 31, 1967. A certificate in the amount of $6,000 was assigned by Mr. Johnson to Mr. Hall on that date. In addition, Mr. Johnson agreed to assign additional FFC in the amount of $33,000 to Mr. Hall on or before December 1, 1967. Mr. Johnson had acquired these FFC in part through direct issue from retains and partly by conversion of "stock" which he had previously acquired, all through his membership in Kitsap.

---

[4] It is not difficult to visualize the mass conversion from "stock" to FFC following the suspension of the "freeze" on April 5, 1969.

Although Mr. Hall's assignments of error are extensive, they may be grouped into six distinct issues. He contends the trial court erred by (1) making findings of fact not based upon substantial evidence in the record; (2) failing to recognize the essential nature of FFC as Kitsap's corporate debt in contradistinction to common stock as corporate equity or ownership; (3) permitting Kitsap's directors to "amend" the terms of FFC by resolution of April 1, 1969; (4) permitting for purposes of priority, transfers of stock to FFC after April 5, 1969, subsequent to sale of Kitsap's assets and subsequent to its insolvency; (5) failing to apply estoppel, waiver or ratification against Kitsap as to Hall's particular certificates; and (6) failing to recognize the Hall FFC as "security" under the Uniform Commercial Code and therefore the equivalent of debt in Hall's hand.

We find substantial evidence in the record to support the challenged findings of fact. A few comments seem appropriate.

■ Mr. Hall has assigned error to the trial court's findings of fact 2-bb, and particularly to the italicized portion thereof, as follows:

Many members of KITSAP have retired from active production over the years thus automatically ceased membership and most withdrew their "stock" reserves, but in later years because of restrictions on its withdrawal, retiring members could not obtain their reserves. *By the end of 1965 a large number of former members existed having reserves in form of "stock" or FFC in their names, amounting to approximately 58% of Kitsap's capital.*

(Italics ours.) We do not find, in the record before us, any evidence to substantiate this precise finding. There is an apparent error either in the date selected or in the percentage of capital owned by former members. No FFC were even accumulated until June 1, 1966. We do note, however, uncontroverted evidence in the record which indicates that as of the end of 1966 approximately 54 per cent of the "stock" was owned by former members. The thrust of the finding, of course, is that at or about the time Kitsap's

board of directors was seriously considering inauguration of the FFC program, a considerable portion—over one-half —of its capital was the property of former members, indicating a need for capital replacement program improvements of some magnitude. Substantial evidence supports this concept. The technical error in the finding does not affect the merits of the appeal.

■ Mr. Hall challenges the description of FFC as "a hybrid financing device." We note that at least one writer in the field has so characterized all revolving fund credits because they are in some regards analogous to capital stock and in some regards analogous to corporate debt but, in truth, they are neither.

> If revolving fund credits or capital credits must be classified or characterized, perhaps they can best be designated as hybrid securities. On an appropriate contractual foundation they are the net worth of the cooperative, and informed creditors so regard them.
>
> . . .
>
> It would seem that although revolving fund credits have characteristics of both share of stock and indebtedness, they are not properly designated as either; they are sui generis.

(Footnote omitted.) F. Kerner, *Securities and Capital Structures of Farmer Cooperatives in California,* 19 Hastings L.J. 309, 311, 315 (1968).

Particularly appropriate is the comment contained in a United States Department of Agriculture Bulletin:

> Courts have not infrequently been perplexed as to the character of particular forms of certificates which were before them, primarily because of their hybrid character and their ambiguous provisions.

(Footnote omitted.) Legal Phases of Farmer Cooperatives, U.S. Dep't of Agriculture, FCS Bull. 10, January, 1958, at 228.

It must be readily acknowledged that the indication of a due date on each certificate tends to impair its status as evidence of equity of the corporation.

It is believed that, as a rule, the certificates issued should not have due dates and should be subject to retirement only at the discretion of the board of directors. If such certificates have due dates, the status as capital of funds which they represent is at least somewhat impaired, because ordinarily a suit may be brought against the association by the holder of such a certificate just as in the case of any other legal claim.

FCS Bull. 10, *supra* at 224.

This brings us directly to appellant's next general assignment of error—that the trial court failed to recognize FFC as evidence of Kitsap's debt and different from its common stock. Appellant properly declares that this issue is the heart of this case. The trial court declared that neither FFC nor "stock" as evidenced on the corporate books constituted either corporate debt or true shares of common stock; they both, however, were evidence of corporate equity. We agree with the trial court's analysis.

The true nature of an agricultural association organized pursuant to RCW 24.32 is best exemplified by statute:

Associations organized hereunder shall be deemed non-profit, inasmuch as they are not organized to make profits for themselves as such, or for their members as stockholders, but only for their members as producers of agricultural products.

RCW 24.32.010 (in part).

Both by state statute and through encouragement by the United States Congress, the somewhat unique democratic control of these cooperatives (one vote per member) and their limited investment potential (dividends or interest on shares of common stock limited to 8 per cent per annum) have been deliberately fostered and preserved. *See* RCW 24.32.210 and 7 U.S.C. § 291. *See also Bowles v. Inland Empire Dairy Ass'n*, 53 F. Supp. 210 (E.D. Wash. 1943). So long as its somewhat unique status is maintained, a favorable financial climate is available through facilities of the Bank for Cooperatives Program. *See* 12 U.S.C. § 1134 *et seq.* Further, the owner of a share of common stock of an agricultural cooperative, and of Kitsap-Mason Dairymen's As-

sociation in particular, has a limited ability to sell his ownership interest only to another member; if he ceases to be an active member, even his limited voting right ceases. Thus, the market for issuance of true shares of common stock of an agricultural cooperative is understandably limited. However, all cooperatives do need working capital in order to thrive. The device generally utilized is establishment of a revolving reserve fund through retention of a portion of the resale price of the product marketed. The revolving fund can be established as a capital fund or as a loan fund.

■ Kitsap's method of providing for working capital, since sometime prior to 1939, was through the use of a revolving fund. Its eminent fairness and necessity is readily recognizable in view of the constant movement of producer members into and out of the association. With a limited market in which to dispose of his equity in the association some practical means must be found to assure a retiring member that in due time his share of the equity will be replaced with "new" capital from those who continue as active members or who newly enter the association. So long as the owner of the certificate or the owner of the evidence of "stock" on the corporate books does not have an unqualified right to demand from the corporation payment of the amount evidenced, he is not a creditor of the corporation. The distinction may hang by a thin wire, but the distinction is vital.

In the instant case, the resolution which created the fund reserved to the board of directors the right to amend the terms and conditions of the certificates issued. The FFC on their face expressly indicated that they were issued and accepted pursuant to the creating resolution and amendments thereto "as may hereafter be made." Clearly, the holder of any such certificate did not have the unqualified right to demand the face amount of the certificate from the association. The holder thereof was therefore not a creditor of the association.

The owner of FFC is also clearly not the owner of shares

of common stock of the association, yet his status is that of an enterpriser in the sense that he owns a share of the equity of the association.

[4] We turn next to consideration of the status of the person whose name appears on the corporate books of the association as the owner of "stock" in a given amount. There can be little doubt that failure of the corporation to actually issue certificates in the name of the party designated on the corporate books is an event of no consequence. *Gamble v. Dawson*, 67 Wash. 72, 120 P. 1060 (1912).

We are concerned, however, with what, precisely, had been purchased by the retains prior to May 31, 1966. Conceivably, the authority for them could be considered in the nature of a continuing subscription for shares of common stock in the corporation. However, as evidenced both by the corporate bylaws and the marketing agreement, the authorization for the retains declared that they be used to purchase something other than true shares of common stock in the corporation. Article 3.3 of the corporate bylaws provided, in part, that any producer who wished to become a member was required to enter into a contract with Kitsap which provided that Kitsap could resell all the producer's dairy products, or derivatives therefrom, and pay over to the member the resale price of the products sold less a proportionate cost of selling, overhead and other expenses, and less "a proportionate amount *for the purpose of paying into reserves hereafter created* for the retirement of bonds or the paying of outstanding indebtedness of the association." (Italics ours.) The marketing agreement, which each member was required to execute, provided that the retains be used for precisely the same purpose.

Authority to place funds in corporate reserves is not authority to purchase shares of common stock in a given corporation, regardless of the nature of the corporation. Much less can it be said that the authority for retains is authority to purchase shares of common stock in corporations which are not organized to make profits "for their members as stockholders, but only for their members as

producers of agricultural products." Although having the appearance of being a cooperative organized with capital stock, Kitsap was in reality operating as a nonstock cooperative. We conclude that Kitsap's members who acquired a credit for "stock" on the corporate books were not owners of true shares of common stock; rather, they were the owners of a proportionate share of money held in a reserve account to be returned to the producer/member when, as and if Kitsap's directors deemed it appropriate to do so.

The primary purpose of the reserves created by both "stock" and FFC was to pay outstanding debts and to provide capital for processing, distributing and selling members' production. A secondary purpose of each was to provide the basis for "revolving" the capital to both retired and active members who had acquired an interest in these reserves. Owners of "stock" had to be content with rotation on a happenstance basis entirely. FFC sought to place the rotation on a more nearly orderly basis. Therefore, it is quite appropriate to classify owners of "stock" and owners of FFC in the same category; both fit into a status which might indeed be categorized as *sui generis*, somewhere between that of creditor and true owner of shares of common stock.

Mr. Hall contends, additionally, that Kitsap's directors had no authority to "amend" the resolution of November 24, 1965 to the extent that it would work a forfeiture of the rights of holders of FFC. If it could be said that the holder of FFC, prior to April 1, 1969, had an unequivocal right as a creditor to demand payment of the face amount of the certificate at the time of the due date thereon, then we could agree with Mr. Hall's position. However, the holder of FFC took them with knowledge, expressed on their face, that they were issued with the understanding that they were subject to future amendments to the resolution which created them. Reference to that resolution would have revealed that the specific power was reserved to the board to amend their terms and conditions. We find no merit to this argument.

Furthermore, Mr. Hall contends that the trial court should not have permitted any transfer from "stock" to FFC after April 5, 1965. Any transfers effected after April 5, 1969 did not in any way assist the transferring party to a higher priority. Granted that some of the transfers were made in the hope of improving priority status, but, in fact, the holder of "stock" on April 5, 1969 might just as well have retained that position. In any event, no transfer in any manner derogated from the rights of Kitsap's creditors.

We are urged also to consider that Kitsap, as an entity on behalf of its members, designed and created FFC causing and permitting them (FFC) to be used for the purposes they were used by Mr. Hall, to wit, permitting their use as "cash" or "negotiable paper" so that subsequent assignees might give full value for them. Therefore, the argument continues, some estoppel, waiver or ratification should be worked against Kitsap in favor of those who did rely upon FFC as a firm obligation usable as "cash" or "negotiable paper."

■ A corporation can neither ratify an otherwise invalid act nor waive its right to maintain a valid position unless there is an intentional relinquishment thereof by the corporation. *Kane v. Klos,* 50 Wn.2d 778, 314 P.2d 672 (1957). There is not the slightest indication in the record that Kitsap ever intended to waive any right or that it intended to ratify an otherwise invalid act.

■ The elements of estoppel, as to the party claiming the estoppel, are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially. *Union Bank v. Kruger,* 1 Wn. App. 622, 463 P.2d 273 (1969). The trial court specifically found —and the record supports the finding—that Mr. Hall relied upon his knowledge of certificates issued by another cooperative of which he had been a long-standing member. Further, there is no indication that Mr. Hall lacked the means to acquire knowledge of the true state of facts. We

conclude that neither estoppel, waiver nor ratification can be employed to provide Mr. Hall with a higher priority over other holders of FFC or holders of "stock."

Finally, we deem it unnecessary to explore or apply any provisions of the Uniform Commercial Code (RCW 62A). By its own terms, the UCC applies to transactions entered into and events occurring after June 30, 1967. RCW 62A.10-101. The real estate contract by which Mr. Hall agreed to accept FFC from Mr. Johnson, in part payment of the sales price, was executed March 31, 1967. Any assignments subsequently made were executed pursuant to contractual responsibilities determined prior to the effective date of the UCC.

Judgment affirmed.

ARMSTRONG and PEARSON, JJ., concur.