BOWLES, Administrator, Office of Price Administration, v. CO–OPERATIVE G. L. F. FARM PRODUCTS, Inc.

Civ. No. 1575.

District Court, W. D. New York.

Dec. 31, 1943.

David A. White, District Enforcement Officer, and Milton H. Friedman, Chief Enforcement Officer, both of Buffalo, N. Y., for plaintiff.

Frederick B. Bryant, of Ithaca, N. Y., for defendant.

KNIGHT, District Judge.

Suit has been brought by the plaintiff to enjoin the defendant from violating the provisions of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 901 et seq. The plaintiff now makes application for an order pendente lite restraining defendant from the violation of the aforesaid act in the respects stated in the complaint.

The defendant is a subsidiary of the so-called Co-operative Grange League Federation Exchange, Inc. The last-mentioned corporation is one of the largest agricultural corporations in the United States. Through several subsidiaries, retailers and agents, it purchases, manufactures and sells large quantities of feed, and supplies seeds, fertilizer and necessary farm supplies for many thousands of farm patrons. The assets of the organization, over and above its capitalization, are the property of its patrons, and the parent corporation acts merely as the agent of the members. After the organization of the Co-operative Grange League Federation Exchange, Inc., in response to the desires of its members, the subsidiary defendant corporation was organized for the purpose of marketing for farmers, vegetables, fruits and other products of the farm including eggs. The quantity of eggs so marketed aggregates many thousands in number, and they are sold through the facilities of the defendant. The defendant, in a strict sense, does not buy eggs from its patrons, but acts as their agent in the sale. At the time of delivery to the defendant, the farmer is paid a certain amount as an advance on the eggs, and later, after its receipt from the sale and the deduction of operating costs, the overplus is paid back to the farmer in the form of a dividend. It appears from the moving papers that the defendant has been selling eggs to a railroad at prices applicable to the sale of eggs at retail.

Considerable of the defendant's brief is directed to a statement of the nature and volume of the activities of the Co-operative Grange League Federation Exchange, Inc., including the defendant corporation, and to the denial of bad faith in the sales of the products in question here.

The Co-operative Grange League Federation Exchange, Inc., has served the needs and enjoyed the confidence of hundreds of thousands of farmers over an extensive territory. There is nothing shown as a breach of good faith. If this were decisive of the matters here considered, it should be held that it has acted in the best of faith. It appears that the Co-operative Grange League Federation Exchange, Inc., and its subsidiary, the defendant corporation, prior to bringing this suit, had voluntarily taken up with the Office of Price Administration consideration of the question of interpretation of the statutes involved in this suit and motion. It seems to me that this suit might well have been avoided by conferences between the parties in interest and some definite position arrived at. It does appear that shortly before this suit was brought defendant was advised that an investigation indicated an "apparent" violation of the statute, and that following this, the defendant advised the plaintiff of its desire to discuss the matter and endeavor to work out an adjustment. Without any reply having been made to this offer, this suit was brought.

However, irrespective of any question of bad faith, the right to an injunction must here be determined upon the construction of the Emergency Price Control Act of 1942, and the regulations adopted pursuant thereto.

Two questions are involved in the motion. First, whether a railroad purchasing eggs for resale in its dining cars is a "commercial" user as that word is used in Maximum Price Regulation No. 333, adopted pursuant to the Emergency Price Control Act of 1942, and can be charged prices applicable to sales "to ultimate consumers except commercial, industrial, institutional or non-federal government users"; and second, whether the defendant should be enjoined from paying to its patrons a so-called "patronage dividend" of 2½¢ per dozen in addition to the maximum price fixed by Maximum Price Regulation No. 333 and in paying consumer's grade price for uncandled or ungraded eggs.

Section 1429.67 of Regulation No. 333, adopted pursuant to the Emergency Price Control Act, supra, purports to fix the maxi-

mum price covering sales of eggs to retailers and commercial and other users. Specifically it is titled "Maximum prices for the sale of shell eggs to retailers and commercial, industrial, institutional and non-federal-governmental users," and it fixes a detailed method of calculating the price, depending upon different grades, etc. Section 1429.68 of Regulation No. 333 covers sellers other than retailers to ultimate consumers. The heading of Section 1429.68, Regulation 333, reads: "Maximum prices of shell eggs sold by farmers, wholesale distributors, retail route sellers, and all sellers other than retailers to ultimate consumers." That section says the maximum prices "for consumer grades of shell eggs sold and delivered by farmers * * * or sellers other than retailers to ultimate consumers," except commercial, industrial, institutional and non-federal-governmental users, shall be calculated by multiplying $1.17, the maximum price for the consumer grade of eggs, as provided by Section 1429.-67 for sales to retailers. Price Regulation 333 does not cover sales of eggs by the retailer. See: Maximum Price Regulations No. 422 or No. 423. The section is intended to apply to sales made directly by the farmer producers or a "retail route seller" to the family user. This section excepts those groups to which Section 1429.67 applies. The two sections distinguish sales to retailers, commercial and other specific users from sales directly to the ultimate consumer. There is no specific definition of a "commercial user" in the statute, nor is there any definition of who are "industrial, institutional and non-federal-governmental users", nor of "ultimate consumer."

The term or expressions are to be construed as having the ordinary meaning given to each. Within such meaning a railroad as here buying eggs from the defendant and selling them in its diners is a "commercial user." It occupies the same status as a restaurant, hotel, or bakery, and these clearly come within the meaning of "commercial users." Each purchases eggs in its trade or business, and this is in the nature of commerce or trade. As defined in Webster's New International Dictionary, 2d Ed. p. 538, commercial means: "occupied with commerce; engaged in trade; * * * relating to or dealing with commerce; * * * of the nature of commerce; as, a commercial transaction; derived by commerce or trade; * * * Having financial profit as the primary aim; * * * Syn. Commercial * * * suggests the larger aspects of the operations of exchange." The ultimate consumer purchases eggs as and for his own food and not for prófit, while the contrary is true as regards the railroad. Given such construction, a railroad is excluded as being an "ultimate consumer."

Defendant's construction of the regulations, supra, would permit sales to practically every individual and every corporation, institutional and non-federal-governmental user purchasing in large quantities, at the same price a single dozen of eggs is sold to any consumer for his individual consumption. Such construction would practically eliminate any market for eggs for sale by the retailer to the small user—the housewife. It is obvious that the clear purpose of Regulation 333 was to fix maximum prices based on a differential between purchaser in large and small quantities. Such a basis is fundamentally necessary to effect the purpose of this law as related to commodities such as eggs.

However oppressed we may seem to be by these and numerous other regulations adopted under the Emergency Price Control Act, if we are to have any price regulation, the regulations in question are consistent with the policy.

Counsel for the defendant calls attention to the fact that Section 1429.65(q)(2) of Regulation No. 333, supra, defines a retailer but that nowhere is there any definition of a consumer which excludes railroad dining cars, hotels and restaurants. This lends no force to the claim that railroads, hotels and restaurants are consumers within the meaning of the act.

Defendant cites the definition of "consumer" as used in the Agriculture and Markets Law of the State of New York, Section 160-a, Consol.Laws N.Y. c. 69, and a decision in a New York court (Grossman v. Hotel Astor, 166 Misc. 80, 1 N.Y.S.2d 307, 310) in which the court held that a hotel was an ultimate consumer. The definition of "consumer" as used in the New York statute has no bearing here since, as we believe, the sections of Price Regulation No. 333, supra, when read together, clearly show an intent to distinguish "ultimate consumer" from users such as railroads, hotels and restaurants. For the reasons hereinbefore assigned, the Grossman case has no applica-

tion. The court there applied the definition to an unusual state of facts, and it said: "It seems to me, therefore, that in this instance, the 'consumer' may well have been the defendant hotel * * *." In Ex parte Mehlman, 127 Tex.Cr.R. 257, 75 S.W.2d 689, in effect did hold that hotels, restaurants and cafes came within the meaning of "consumer", but this court is not disposed to follow this conclusion in view of what it is believed the intent of the Emergency Control Act was and the ordinary meaning of the word "commercial."

■ It is urged that the defendant is entitled to pursue its present practices in the sales to railroads by virtue of the provisions of Section 2(h) of the Emergency Price Control Act of 1942. That section says that "this section shall not be used * * * to compel changes in business practices, cost practices or methods, * * *, established in any industry." If this contention has merit, the price-fixing regulation would be of little effect. Further, if these sales come within the meaning of "business practices", the section especially provides that these shall not be used to "prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act."

■ The plaintiff is entitled to an injunction pendente lite to restrain the sale of eggs to railroads at prices in excess of those permitted by the Maximum Price Regulation No. 333, Section 1429.67.

■ It is admitted that the defendant has been paying its patrons so-called "patrons dividends" after sales of the eggs by defendant. The dividend of 2½¢ per dozen of eggs is paid in addition to the payment of the O. P. A. ceiling price for consumer grade eggs. This dividend is an arbitrary amount and is paid without regard to the corporation's earnings and without regard to whether the individual seller contributes to the company's earnings by any other sale. The payment of "patronage dividends", defendant states, has been discontinued. Irrespective of such discontinuance, the court has the authority to grant an order enjoining further payment of these dividends. Section 205 and 205(a), Emergency Price Control Act. This court is of the view, however, that the exercise of this authority is discretionary, and it would be loath to grant an injunction here had the defendant declared that there will not be a recurrence of the violation. The defendant,

however, says that it "does not intend to resume this practice (paying patronage dividends) until sufficient current earnings have been accumulated to make necessary distribution of such earnings to current patrons." This does not go far enough. There still might be a violation through the payment of dividends, provided the ceiling prices were not observed. Therefore an injunction should be issued.

The point that the defendant is paying consumer grade prices of uncandled and ungraded eggs was raised after the motion herein had been argued. The complaint itself is, however, sufficient to present proof of such purchases. The plaintiff submits an affidavit supporting its position in this respect, and the defendant has answered by affidavit. The government claims that the Maximum Price Regulation No. 333 sets up two types of ceiling prices prior to the retail level; in pursuance of Section 1429.65 (S) (1) (Regulation 333) section 1429.67 (Regulation 333) fixes ceiling prices for the "consumer grade" type graded according to the standards set up by the U. S. Department of Agriculture in certain grades as presented in the publication entitled "Tentative U. S. Standards and Weights for Wholesale Grades for Shell Eggs"; that these must be candled eggs and that Section 1429.67 a (Regulation 333) fixes the price for eggs which have not been candled or segregated and are not in the "consumer quality grade" as specified by U. S. Department of Agriculture in the standards set up as aforesaid.

Whether eggs meet approved standards can only be determined after they have been candled. It follows that the U. S. Government standards were intended to and do apply only to "consumer grade" eggs, i. e. eggs which had been candled. Section 1429.67-a applies to wholesale grades for which a price of purchase was less than that fixed at the ceiling price of 1429.67. The lower price was fixed because the cost of candling was eliminated.

The defendant says it takes Section 1429.65(s)(1) supra, when read in connection with the said U. S. Department of Standards, to mean that a "consumer grade egg" is an egg which meets the standard, but that, as defendant uses the expression in support of its contention, it "puts the cart before the horse," for the eggs must first be candled before the standard can be applied. Regulation 333, as issued by

the Office of Price Administration, includes a total of sixty finely printed pages. It is to be little wondered that confusion might arise in the construction of the meaning of some provisions.

■ The defendant claims that it purchases its eggs from farmers as "consumer grade eggs" and that it places on the farmer the burden of meeting the requirements set by the Department of Agriculture; that the farmer does the grading and receives pay for graded eggs "which it is assumed meets the consumer grade standard." It is further asserted that defendant makes a "spot check" and in some cases a complete re-check of farmers' grading to make certain that the eggs are consumer grade. If the eggs purchased are candled there is no violation.

■ An injunction may issue restraining defendant from purchasing "uncandled" eggs at prices in excess of those fixed under Section 1429.67-a (Regulation 333).