852

Alex Elson, Robert B. Johnstone, Fred J. Keefe, and Francis L. Zimmerman, all of Chicago, Ill., for Office of Price Administration.

Walter M. Nold, R. G. Macdonald, and Sidley, McPherson, Austin & Burgess, all of Chicago, Ill., for defendant.

CAMPBELL, District Judge.

Plaintiff, Administrator of the Office of Price Administration, seeks triple damages and a preliminary and final injunction for alleged violations of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 ff., and of the General Maximum Price Regulation (7 Fed.Reg. 6616) issued under sec. 2(a) of the Act.

Defendant is a Delaware corporation engaged in supplying certain transportation services to American railroads, otherwise than as an employee, in connection with the distribution of commodities in each of the states of the United States and in Alaska. The plaintiff alleges that on August 31, 1943, and on various dates thereafter, defendant has supplied such services at prices in excess of the maximum prices established therefor under the provisions of the Regulation. None of the services so supplied was made to purchasers for their own use or consumption other than in the course of business.

The plaintiff also alleges that among such services were those supplied to the Illinois Central Railroad Company with respect to the distribution of commodities in central Illinois, for which, after August 31, 1943, defendant demanded and received from the said railroad, amounts in excess of the base period price aggregating $6,737.27, for which plaintiff asks triple damages under Sec. 205(e) of the Act.

Plaintiff also alleges on information and belief that defendant has likewise supplied services to numerous railroads, listed in a schedule attached to the Complaint, in excess of the prices charged during the base period established by the Regulation. Plaintiff likewise prays triple damages for these sales of services, but in no event less than the triple damages prayed in the case of services to the Illinois Central Railroad Company, with costs.

Plaintiff also prays for a preliminary and final injunction, under Sec. 205(a) of the Act, to restrain defendant from all violations of the General Maximum Price Regulation, and to enforce compliance with Sec. 4 of the Act.

The defendant moves to dismiss the complaint on three main grounds:

1. The performance of the so-called "miscellaneous transportation services" by the defendant Agency for the railroads does not constitute a sale of such services at a price within the meaning of the Emergency Price Control Act of 1942.

2. If a sale of services within the meaning of the Act is involved here, it is a sale by a common carrier or other public utility, whose rates are exempt from regulation under the Act by Sec. 302(c).

3. If the plaintiff may control such charges, the defendant has not violated any regulations issued by the plaintiff, in the light of the plaintiff's enforcement policy and the statements of his representatives, relied on by the defendant.

The case is thus before the court on the motion to dismiss. The facts concerning the defendant's business are set forth in great detail in the answer, briefs, answers to interrogatories, and affidavits.

It appears that the defendant is a joint agency and facility of the railroads of the United States, pursuant to the Express Operations Agreement of March 1, 1929, approved by the Interstate Commerce Commission. Its chief function is to conduct the express transportation business for the railroads. It collects the revenues resulting from its operations, deducts expense and other items in accordance with the Uniform System of Accounts of the Interstate Commerce Commission, and distributes the remainder, as "Rail Transportation Revenue", to more than 300 railroads, subject to the Express Operations Agreement, in proportion to the gross express transportation revenues earned on the respective lines. Although the defendant's capital stock consists of 1000 shares of no par value, issued for cash at $100 per share, and owned entirely by the seventy principal railroads of the United States (which perform over 98% of the rail express business of the nation), the defendant makes no profits and pays no dividends. The express transportation business, which constitutes the great bulk of the defendant's operations, is not involved in this suit. The gross operating revenues, income and other credits of the

Agency for the year ending December 31, 1943 were $354,058,280, of which $5,975,814 were derived from miscellaneous transportation services which are the only item of defendant's business involved in this suit.

The so-called miscellaneous transportation business, the subject matter of this complaint, consists of store-door pick-up and delivery of less than carload freight, transfers of less than carload freight between railroad terminals in municipalities, and over-the-road motor vehicle transportation of less than carload freight between railroad terminals in different municipalities. No charge for such service is made by the defendant to the shippers, but the shippers pay the railroads rates contained in tariffs approved by the Interstate Commerce Commission and State regulatory bodies having jurisdiction. In the performance of this miscellaneous transportation business, the defendant performs, at cost, for the railroads, which absorb the charges, a portion of the common carrier obligations of the railroads.

No flat rate is charged for these services. The performance of these services at cost requires that the rate be adjusted from time to time in specific cases. This adjustment is necessary because not all of the railroads use the defendant's miscellaneous transportation services. If these services were not performed at cost, the pool of revenue, earned from the express transportation business and due the railroads in proportion to their share of such business, would be decreased, with the result that railroads not using the miscellaneous transportation services of the defendant would be paying part of the costs of those railroads which do use it.

On or about May 31, 1941, the Illinois Central Railroad Company entered into an agreement with the defendant, whereby the latter agreed to supply equipment and employees for the transportation by motor vehicle of less-than-carload freight between certain points in Illinois. The charge to be paid by the railroad for this service was originally set at 13¢ per truck mile. Before this agreement was put into effect, the Illinois Central Railroad Company applied for and received from the Interstate Commerce

Commission a certificate of convenience and necessity allowing it to facilitate the transportation of less-than-carload freight by the use of motor vehicle transportation as contemplated in the aforesaid agreement. Authority for the use of certain routes was also obtained from the State of Illinois. The agreement was later amended to include the transportation of United States mail and parcel post shipments. The Agency also transported baggage in its motor vehicles. The Agency had no part in fixing the rates charged for the shipment of less-than-carload freight, United States mail and parcel post, or baggage.

The increase in the rate charged the Illinois Central Railroad by the Agency, from 13¢ to 14.3¢ per truck mile, the basis of the complaint in this case, was made effective on February 1, 1943. The plaintiff is suing for damages only from August 31, 1943, because of the one-year statute of limitations in the Emergency Price Control Act of 1942. 50 U.S.C.A.Appendix, § 925(e). A subsequent increase, to 16.25¢, was made with the consent of the Regional Administrator of the plaintiff as of June 30, 1944, the defendant, however, not conceding the jurisdiction of the plaintiff over such rates. Despite these increases, the Illinois Central Railroad has not increased its rates to shippers.

It is the opinion of the court that the defendant, the agent of the railroads subscribing to the Express Operations Agreement for the conduct of the express transportation business and for the collection and distribution of the revenues accruing therefrom (Article II, Sec. 1 of the Agreement) is likewise the agent of the carriers in the performance of the miscellaneous transportation services pertinent to this case. The defendant has a paid-in capital of $100,000. It has neither a paid-in nor an undistributed surplus. Yet it did a gross business for the year ending on December 31, 1943 of over $350,000,000. The capitalization thus is purely nominal. The defendant does not stand on its own feet as a financially independent corporation, but draws its strength from the fact of its being the exclusive agent of the subscribing railroads in the express transportation business. Its revenues, after items of expense are deducted, are distributed to the subscribing railroads in proportion to their share of the total express business carried on their lines. The Agency is thus a kind of cooperative, although its membership is not the sort contemplated by the Rochdale pioneers. The relationship between a cooperative and its members is generally regarded as one of agency. Bowles v. Inland Empire Dairy Association, D.C.Wash., 1943, 53 F.Supp. 210, and cases cited therein.

If each carrier supplemented its rail service with motor vehicle services of the type involved here, and rendered the services themselves through a new department which acquired the personnel and equipment necessary thereto, there could be no objection, from the point of view of the public and of the administrative agencies which protect the public interest, that each carrier maintained this new department by absorbing its cost in the line haul rate, which is already subject to public regulation, and did not pass the increased cost on to the public. It should be, and is, immaterial that the carriers have chosen to render this portion of their transportation services through the convenient agency of the defendant, which has the equipment, personnel, and experience, and performs the service at cost. Having chosen to use the instrumentality already at hand, the defendant Agency, the carriers could have arranged to pay the cost of its services by deductions from their share of rail transportation revenue. It should be, and is, immaterial that they have chosen not to use this method, by making bookkeeping adjustments, but pay the defendant as though it were an outside contractor.

Cooperatives, of course, are not exempt from price control. In dealing with outsiders, a cooperative may not sell at prices above the applicable ceiling price set by the Administrator. Bowles v. Co-operative G. L. F. Farm Products, Inc., D.C.W.D.N.Y., 1943, 53 F.Supp. 413. The essence of this case, however, is that sales to outsiders are not involved.

The plaintiff devotes much of his brief to a review of cases holding that the existence of a separate corporate entity will not be disregarded, except where necessary to

avoid the perpetration of a fraud or to prevent evasion of a regulatory statute. The liability of the defendant as a separate corporate entity for taxes or torts is immaterial in considering whether a specific statute or regulation applies to it. The defendant was certainly not created to avoid the General Maximum Price Regulation, and miscellaneous transportation services were offered by the defendant to its principal railroads as far back as 1938. The plaintiff states that the present case involves a situation "even more anomalous" than the usual case where a parent corporation seeks to have a subsidiary treated as part of the parent, or where stockholders attempt to disregard the fact that the corporation is a separate entity in order to obtain an advantage which the corporation could not obtain for itself, in that the defendant maintains that it is the facility not only of the seventy railroads owning its stock, but of the more than three hundred railroads executing the Express Operations Agreement. There is really nothing anomalous in this situation; it is the normal relationship between a cooperative and its members. Nor is there any question here of the stockholders' (or members') obtaining an advantage which the defendant corporation could not obtain for itself, since only a repayment of the cost incurred by the cooperative in rendering services for its members is involved, without any passing on to members of the consuming public or other outsiders of the financial burden thereby borne by the railroads as part of their service to shippers.

The truly "anomalous" nature of this case is revealed by one of the plaintiff's exhibits, entitled "Statement of Considerations Involved in the Issuance of Amendment No. 175 to Supplementary Regulation No.14 To the General Maximum Price Regulation", dated May 20, 1943. It indicates that the Administrator was concerned exclusively with the possibility that the pick-up and delivery services supplied line haul carriers by contract with local independent carters might disappear by reason of the carters' shift to the more lucrative, because unregulated, common carrier operations. The result apparently feared by the Administrator was that, with the line haul carriers no longer able to supply local pick-up and delivery service to shippers because of the refusal of local carters to contract with the carriers for such service, shippers would be forced to seek the services of local carters as common carriers at whatever prices the traffic would bear. For this reason, the Administrator adopted a policy of allowing controlled increases in the price paid by carriers for such service in order to induce local carters to continue serving line haul carriers and, through them, the shippers. It does not appear that the Administrator was concerned, at that time, that an agent carter, like the defendant here, performing its services as nearly at cost as it is possible to estimate, might over-charge its principal. (Local pick-up and delivery service constitutes most of the defendant's miscellaneous transportation services. On October 31, 1944, the Agency was performing approximately 1,425 pick-up and delivery operations, 580 transfer operations within a municipality, and 150 over-the-road operations between different municipalities.) Indeed, the prices charged by independent local carters appear to have long been a matter of concern to the carriers. As long ago as February 1, 1938, when the defendant Agency offered to perform, at cost, pick-up and delivery of less-than-carload freight for the railroads at any point where it had vehicle service, the fact that local drayage companies were demanding increasingly higher payments for their services was mentioned in a letter to the carriers from the Agency and contrasted with the Agency's service at cost. The Administrator's power over the charges of such independent drayage companies is of course not involved in this case.

Since I hold that the defendant renders miscellaneous transportation services to the railroads as an agent and not as a seller, it is unnecessary to consider the second and third defenses raised in the answer. The defendant's motion to dismiss is granted.

Although not bearing on this decision, it seems to the court worthy of mention in passing that the Administrator might better channel the efforts of his necessarily limit-

ed staff to cases more directly affecting the cost of living of the average consumer Although his efforts to give equal protection of the laws to all, no matter how large and powerful, is praiseworthy, it would seem that the railroads of America can adequately protect themselves when dealing with their creature, the defendant, whose revenue derived from miscellaneous transportation services amounted to slightly over 1½% of its gross income for the calendar year 1943; and that the ultimate consumer confronted with shortages in such essentials as clothing and shelter and with the subterfuges adopted by the bold and the clever which are matters of common knowledge to avoid ceiling prices on such necessities is more deserving of the Administrator's solicitude.